THIRD DIVISION
September 17, 2008

No. 1-07-0308

| | | |
|---|---|---|
| *In re* MARRIAGE of DONNA TUKE HEROY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee and | ) | Cook County. |
| Cross-Appellant, | ) | |
| | ) | |
| and | ) | No. 03D10451 |
| | ) | |
| DAVID F. HEROY, | ) | The Honorable |
| | ) | Elizabeth M. Budzinski, |
| Respondent-Appellant and | ) | John O. Steele, |
| Cross-Appellee. _____ | ) | Marya T. Nega, |
| | ) | Judges Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

In November 2006, the circuit court of Cook County entered an order dissolving the 26-year marriage of respondent David Heroy and petitioner Donna Tuke Heroy. In addition to dissolving their union, the court made findings of fact pertaining to the value of the couple's marital and nonmarital estates and distributed the marital estate between the parties. Specifically, the trial court awarded David 45% of the marital property and Donna 55% of the marital property. The trial court further ordered that Donna receive $35,000 per month in permanent maintenance as well as retroactive temporary maintenance in the amount of $4,500 per month. Both parties appeal various orders entered in the trial court. On appeal, David disputes the maintenance and property distribution awards ordered by the trial court. Specifically, David contends that the trial court failed to properly consider the relevant factors outlined in the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 et seq. (West 2006)) in

distributing the marital property and awarding maintenance and committed several valuation errors. Donna, in turn, contends that the trial court erred in finding that various real estate holdings acquired by David during the marriage and several accounts established by David during the marriage were non-marital property. We affirm as modified and remand with directions.

David and Donna married on September 13, 1980. At the time of their union, both parties had obtained law degrees and had established professional careers. Donna was working full-time as a law librarian, while David was a practicing attorney. During their union, the Heroys had three children. Following the birth of the couple's second child, Donna quit her career as a law librarian and devoted the majority of her time to raising the couple's children and managing the household. David continued working as an attorney throughout the duration of the marriage and was the primary breadwinner of the family.

On September 30, 2003, Donna filed a petition for dissolution of marriage. David responded with a counterpetition for dissolution of marriage, alleging irreconcilable differences. Thereafter, Donna and David entered into a joint-parenting agreement with respect to their minor son John, which provided for Donna to be John's primary residential parent and for David to finance John's educational expenses. In addition, the parties conducted discovery and filed various motions pertaining to the nature and value of their marital and nonmarital assets. The trial court entered a number of summary judgment orders resolving issues related to the value and classification of various assets.

The primary dispute between the parties concerned issues of property distribution and

maintenance. Donna requested $63,000 per month in permanent maintenance and 65% of the marital estate. She also requested retroactive temporary monthly maintenance amounting to $10,000 to compensate her for her expenses during the divorce proceedings. David, in turn, proposed an equal division of the marital estate in lieu of any maintenance. The trial court conducted a hearing to resolve the parties' dispute concerning the distribution of marital assets as well as the issue of maintenance.

At the hearing, Donna and David provided testimony about the roles they assumed during the marriage as well as the standard of living that they enjoyed. At the time of their union, Donna and David had completed their educations and were working professionals. Donna had received a master of library science degree from Indiana University as well as a juris doctorate degree from DePaul University, and at the time of their marriage in 1980, she was employed full-time as the head law librarian at Friedman and Koven. David also held a juris doctorate degree, which he received from the University of Michigan, and was a practicing attorney at Gardner, Carton and Douglas when they married. Following their union, the couple embarked on divergent career paths.

In 1981, Donna was hired as the chief law librarian at Winston and Strawn. She also started her own publishing company, Alert Publications, Inc. (Alert), which published newsletters for use in law and business libraries. On January 7, 1983, Donna gave birth to Elizabeth, the couple's first child. After taking a three- to four-month maternity leave, Donna resumed her full-time job at Winston and Strawn. Emily, the couple's second child, was born on February 7, 1985. Donna initially returned to work part-time following Emily's birth, but

resigned her position as chief law librarian at Winston and Strawn in 1987. Following her resignation, Donna never resumed full-time employment outside of the home. Instead, she devoted approximately 10 hours per week to her publishing company, earning $5,000 annually. Donna gave birth to the couple's final child, John, on April 25, 1990.

David, however, continued working throughout the marriage and was the family's primary source of economic support. He began his legal career at Gardner, Carton and Douglas in 1976, earning approximately $18,000 per year. His salary rose to approximately $240,000 per year. In 1989 David commenced employment at Neal, Gerber and Eisenberg, where he became the chairperson of the bankruptcy department, earning approximately $350,000 to $475,000 annually. David then transferred to Bell Boyd & Lloyd in 1997, where he was the chairperson of the firm's bankruptcy department as well as a corporate partner. In 2000, David was named an equity partner at the firm and became a member of the firm's executive committee. Despite his high earnings, David indicated at the hearing that he expected a 30% to 40% decrease in his compensation over the next two to three years due to fundamental changes in the bankruptcy business. In addition to receiving income from his law firm, David indicated that throughout the marriage he received substantial stock and real estate rental income from Angola Wire Products, Inc. (AWP), a company started by his parents in 1961 that customizes steel wire products. Because David holds the office of AWP's assistant secretary, he also receives a $800 monthly honorarium from AWP.

Despite their different career paths, Donna and David were both actively involved in the lives of their children. When the children were younger, Donna handled all of the details

pertaining to their medical care and was active in their social lives. She threw the children birthday parties, planned play dates, and helped them select and make Halloween costumes. Raised Roman Catholic, Donna also took control over the children's religious upbringing and enrolled them in Sunday School. David, in turn, worked until 7 or 8 p.m. each night, but would read to the children upon his return home. In addition, he taught each of the children how to ride bicycles and spent significant time with them on the weekends.

Each of the Heroy children played musical instruments, and Donna and David were both active in their children's musical endeavors. They both drove their children to their music lessons and summer music camps and attended their musical recitals. Donna also enrolled in a music note-reading class to better assist her children with their music efforts, while David assumed the role of John's "Suzuki coach," which involved a 10- to 15-hour weekly commitment on David's part.

Donna and David also assumed active roles in their children's educational lives. The Heroys enrolled their children in private schools, which required significant parental involvement. While their children attended the Lincoln Park Cooperative Nursery School, Donna and David both spent time in the classroom and Donna was president of the school board from 1986 to 1987 and was active on several committees. Following their completion of the Lincoln Park Cooperative Nursery School, the Heroy children attended The Latin School. Donna and David both attended parent-teacher conferences and assemblies at The Latin School and David served as a trustee of the school for nine years.

All of the Heroy children attended boarding school during high school: Elizabeth

attended Phillips Academy in Andover, Massachusetts, during her junior and senior years; Emily was enrolled in The Interlochen Arts Academy in Michigan during her junior and senior years; and John began attending Phillips Academy as a freshman in high school and was still enrolled at Phillips at the time of the hearing. David thoroughly investigated the boarding schools prior to enrolling his children in them, and Donna, in turn, helped the children move into their boarding school residences. David and Donna both attended "Parents Weekend" at their children's schools, and when Elizabeth and Emily completed high school, assisted them with their college selection efforts. Donna traveled with their daughters to visit various schools around the country in which they had expressed an interest, and both David and Donna read over, and provided feedback on, their respective college admissions essays. Elizabeth attended Northwestern University and then transferred to Brown University, while Emily received her degree from New York University. David paid each of his daughters' college tuition bills. Moreover, upon Elizabeth's graduation, David helped Elizabeth obtain interviews and secure a job.

The Heroys purchased several upscale residences throughout their 26-year union. Shortly after their marriage, Donna and David purchased a co-operative apartment located at 399 West Fullerton in Chicago. The 3,000-square-foot unit contained three bedrooms, a dining room, living room, and a library, as well as several wood burning fire places. Their residence was located in a vintage building that was equipped with indoor parking, a 24-hour doorman, and a garage valet service. Immediately following their purchase, the Heroys spent several hundred thousand dollars renovating the residence and Donna indicated that she assumed an active role in the renovation process, selecting various colors and materials to be used in their renovation

project.

After John's birth, the Heroys moved to another co-operative apartment, located at 2450 North Lakeview. They remained in the residence throughout the remainder of their union. The four-bedroom 6,000-square-foot apartment was located in a building erected in the 1920s by famous architect Howard Van Doren Shaw and was featured in a book on Chicago apartments. In addition to the four master bedrooms, the residence contained a kitchen, living room, dining room, library, laundry room, breakfast room, wine closet, and five fireplaces. As with their prior residence, the Heroys also conducted extensive renovation on this apartment, spending approximately $1 million on improvements to the property shortly after the purchase. As with their prior renovation efforts, Donna indicated that she was very involved with the project and had frequent interactions with decorators and workmen. David and Donna both flew to England several times to purchase antiques and lighting fixtures for their home. The Heroys conducted minor renovation on the residence several years later, spending approximately $200,000 to $300,000 on the project. During the divorce proceedings, the parties agreed to sell their marital residence for $7,051,000.

In addition to their Chicago residences, the Heroys purchased a Michigan vacation home in 1989. The couple renovated the house twice, and Donna and David both indicated that they were actively involved in the renovation efforts. Purchased for approximately $235,000, the parties agreed that the value of the residence at the time of the divorce was $768,000. The Heroy family used their Michigan vacation home for approximately four to five weekends per year in the summer months.

7

In addition to enjoying their summer vacation home, the Heroys traveled extensively throughout their marriage and took a number of domestic and international trips with their children. Their destinations included: California and Florida as well as London, Cornwall, Portugal, Dublin, Prague, Paris, Egypt, and Budapest. Moreover, in 1998 Donna and the children lived in England for six months so they could experience living abroad. When the Heroys traveled, they flew in either first or business class, although David indicated that he purchased tickets in economy class and used his frequent flier miles to upgrade his family to first or business class seats. The Heroys also stayed at high-end hotels and dined at expensive restaurants during their travels. Because some of their family trips corresponded with David's business travel, David was able to write off some portions of the family's travel expenses as business expenses. In addition to spending substantial sums on real estate and travel, the Heroys also amassed impressive wine, art, and antique collections, worth hundreds of thousands of dollars. Moreover, throughout their union, the Heroys employed household help. Most notably, the couple hired Shirley King in 1984 to assist Donna in caring for the children. Shirley worked every weekday from 7 a.m. to 6 p.m. and remained in their employ until the divorce commenced. In addition, the Heroys employed a cleaning woman who worked two days a week, a laundress who worked once a week, as well as various private chefs.

Both parties provided expert testimony about the Heroys' spending history and Donna's maintenance needs. Cathleen Belmonte-Newman, a certified divorce financial analyst, testified as Donna's retained financial expert. In performing her lifestyle analysis in the case, Belmonte-Newman testified that she initially reviewed credit card records, bank statements, and cancelled

check records, which she then input into a computerized database. She explained that the database produced a cash flow report that depicted a historical perspective of spending, which she then used to compile a list of projected expenses. In reviewing the Heroys' spending history, Belmonte-Newman indicated that she asked Donna to clarify any charges that were not readily apparent. Belmonte-Newman acknowledged that her analysis did not include any business expense reimbursements that David received from Bell Boyd and Lloyd because she did not have access to that information. Moreover, Alert's expenses were also excluded from her analysis. Accordingly, she did not include Shirley King's $1,500 monthly salary, which was paid by Alert, in the Heroys' lifestyle analysis. Based on her review of the Heroys' financial records, Belmonte-Newman determined that between January 1, 2000, to December 31, 2003, the Heroys spent a total of $5.8 million or $1.451 million per year. The $5.8 million figure included legal fees and federal taxes paid by the parties but did not include any expenses for Alert or AWP. After compiling the parties' spending history, Belmonte-Newman concluded that Donna's projected monthly future expenses amounted to $56,016, which included the children's expenses, including educational expenses. Moreover, Belmonte-Newman acknowledged that in projecting Donna's future expenses, she assumed that Donna would have a new residence with a purchase price of $2 million, secured by a 15-year, $1 million mortgage. This assumption was based on conversations she had with Donna concerning Donna's future living arrangements. Belmonte-Newman also acknowledged that her estimate did not make an allowance for any property settlement, which she conceded would decrease Donna's projected expenses.

Bruce Richman, a certified public accountant and divorce financial analyst, testified as

David's retained financial expert. He reviewed the Heroy's financial records, interviewed David, and attended Donna's deposition to gather information with which he was able to analyze the Heroys' expenditures from 2000 to 2004. In performing his analysis, Richman utilized a similar methodology to that employed by Belmonte-Newman. Specifically, he input data provided by credit card statements and check registers into a database, and segregated the expenses into various categories including transportation, entertainment, and dependent expenses. Based on his conversations with David, Richman was able to come up with figures representing the Heroys' annual gross and net expenditures. Specifically, he received data from David's law firm which allowed him to account for reimbursed business expenses and to ascertain the Heroys' net expenditures. Richmond also excluded expenses that he deemed "capital expenditures," including money the Heroys spent on their wine, art, and antique collections as part of their net expenditures.

Richmond reviewed the report prepared by Cathleen Belmonte-Newman and indicated that he disagreed with some of her conclusions, specifically, the amount of monthly expenses that Donna reasonably needed subsequent to the divorce. Richman opined that Belmonte-Newman's "report significantly overstates the monthly expenses reasonably needed for Mrs. Heroy." In particular, Richmond indicated that he felt that Belmonte-Newman's projected housing cost was "way too high" and that the projections for various other expenses including car, clothing, travel, decorating and repair expenses were also inflated. Accordingly, he made adjustments to various expense projections and concluded that Donna's reasonable monthly expenses totaled $11,547.

The parties also provided expert testimony concerning Donna's employability. Grace

Gianforte, a licenced clinical professional counselor, was David's retained expert and provided a vocational evaluation of Donna. Specifically, Gianforte reviewed Donna's educational degrees, work background and training to determine her future employability and earning potential. She did not interview Donna herself, however, and did not know when Donna stopped working full time. Nonetheless, Ginaforte opined that "Donna is eminently employable," based on the fact that Donna worked for 12 years as a law librarian and 19 years as a writer, editor and publisher for Alert. Gianforte indicated that the publishing industry would provide Donna with an earning potential from between $107,000 to $171,000. Moreover, a career as a law librarian would provide Donna with an earning potential of approximately $127,000 per year. Gianforte did not assess Donna's earning potential as an attorney, however, because she was aware Donna's law license had lapsed and, accordingly, she did not consider a legal career to be a likely employment option. Gianforte acknowledged that her conclusions as to the job market for publishers and law librarians was based on national and statewide data and that she did not conduct any research on the job market in Chicago.

Donna, in turn, provided the testimony of two experts who discussed her employment prospects in the publishing and law librarian fields. David Nelson, a journalism professor at Northwestern University and an expert in the newsletter and publishing industry, provided testimony pertaining to Donna's employment prospects in the publishing industry. After revealing that the newsletter industry was in a state of decline, Nelson opined that Donna did not possess the requisite skill sets to obtain a high paying job in the publishing industry, explaining that "[s]he doesn't have marketing skills, she hasn't kept up with industry standards in the

newsletter industry or comparable publishing opportunities." Accordingly, Nelson indicated that the conclusions drawn by David's expert, Grace Gianforte, regarding Donna's strong job prospects in the publishing industry were "not supported." With respect to Alert, Nelson noted several problems with the continued viability of Donna's publishing company. Specifically, he noted the lack of marketing efforts and the failure to make the newsletters available electronically.

John C. Strzynski, a former national recruiter for law librarians and a qualified expert in the law librarian industry, offered testimony as to Donna's employment prospects as a law librarian and indicated that he "disagree[d] completely" with Gianforte's conclusions as to Donna's employability as a law librarian. Initially, he noted that because of technological advances, the job prospects for law librarians, particularly the prospects for law librarians in Chicago, was "rather pathetic." Moreover, with respect to Donna's prospects in finding employment in today's market, Stryznski opined that "she's tremendously disadvantaged in any attempt to get back into the law library profession" due to her long absence from the workforce. In the report that he prepared in which he analyzed Donna's job prospects, Strzynski explained:

"The sad fact is that she is not qualified. She has not worked in the profession for twenty years. This fact alone will prevent her from competing for jobs. Further, she lacks critical technological skills. She has not worked with online catalogs. She has no experience working with imaging systems. She has not created web-based platforms for the delivery of legal information. Third, she will be in competition with many qualified law librarians who have been honing their skills while Ms. Heroy has been away. In

conclusion, the simple truth is that Ms. Heroy has not kept up and the profession has passed her by."

Strzynski, however, conceded that it was possible that Donna could learn the skills necessary to be eligible for a head law librarian position, but indicated that it would be "extremely tough [for Donna] to get back in" to the profession.

In addition to providing the trial court with evidence pertaining to their standard of living, Donna's maintenance needs and employment prospects, the parties also submitted evidence pertaining to the valuation of various marital and nonmarital assets. Specifically, the parties submitted reports in which their retained experts valued Alert as well as David's AWP stock and real estate interests.

After hearing 19 days of testimony, the trial court filed a thoughtful and comprehensive written 58-page order on November 21, 2006, in which it made various factual findings and resolved issues pertaining to property distribution and maintenance. In pertinent part, the trial court found that the Heroy's marital estate was valued at $8.7 million and consisted of two homes, retirement plans, personal property, and Donna's publishing business. The court further found that Donna and David had vastly different non-marital estates. Donna's "nominal" non-marital estate was valued at $154,012.22 and consisted of an inheritance and her jewelry collection. David's "substantial non-marital estate" included his real estate and stock interests in AWP and totaled $4,040,944.80.

After making various findings pertaining to the value of certain property, the trial court made rulings on the issues of property distribution and maintenance. In distributing the marital

13

property the court held:

> "Based on the parties' 26 year marriage, Donna's age, her limited ability to earn income or acquire assets in the future, David's earning potential, the value of the marital estate in comparison to David's income and David's large non-marital estate, the court finds that it is appropriate to award a disproportionate share of the assets to Donna. Accordingly, Donna is awarded 55% of the marital estate and David is awarded 45% of the marital estate."

Regarding the issue of maintenance, the court found:

> "During the parties' 26 year marriage, Donna stopped working to devote her time to raising three children and managing the Heroy household. Donna has been out of work for 20 years. As a result, her earning potential and employment opportunities are severely limited. It is unlikely that Donna with ever be able to support herself in any reasonable approximation of the standard of living established during the marriage."

Accordingly, the court ordered that Donna receive "$35,000 per month in maintenance, which is taxable to Donna and deductible by David. The maintenance is modifiable or will terminate pursuant to 750 ILCS 5/504." The court further found that Donna was entitled to retroactive temporary maintenance holding: "Donna is awarded maintenance in the amount of $4,500 per month retroactive to November 24, 2003. This is in addition to the $6,000 a month temporary support David paid to Donna during the divorce proceedings."

Both parties filed timely notices of appeal disputing various rulings made by the trial court. We will first address the arguments that David has raised on appeal.

1-07-0308

David first disputes the propriety of the maintenance award. Specifically, he contends that the trial court erred in awarding Donna permanent maintenance because she holds two advanced degrees and is thus capable of supporting herself.

As a general rule, "a trial court's determination as to the awarding of maintenance is presumed to be correct." In re Marriage of Donovan, 361 Ill. App. 3d 1059, 1063 (2005). Because maintenance awards are within the sound discretion of the trial court, we will not disturb a maintenance award absent an abuse of discretion. In re Marriage of Schneider, 214 Ill. 2d 152, 173 (2005); In re Marriage of Samardzija, 365 Ill. App. 3d 702, 707 (2006). An abuse of discretion exists only where we can conclude that no reasonable person would take the view adopted by the trial court. Schneider, 214 Ill. 2d at 173; In re Marriage of Hasabnis, 322 Ill. App. 3d 582, 592 (2001). It is the burden of the party challenging the maintenance award to show an abuse of discretion. Schneider, 214 Ill. 2d at 173; In re Marriage of Wojcik, 362 Ill. App. 3d 144, 168 (2005).

Maintenance awards are governed by section 504 of the Act, which sets forth 12 factors to consider in awarding a spouse maintenance. 750 ILCS 5/504 (West 2006). These factors include:

> "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;
>
> (2) the needs of each party;
>
> (3) the present and future earning capacity of each party;
>
> (4) any impairment of the present and future earning capacity of the party seeking

15

maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504 (West 2006).

No single factor is determinative when considering the duration and amount of a maintenance award, and the trial court is not limited to a review of the factors outlined in section 504 of the Act in setting a maintenance award. In re Marriage of Murphy, 359 Ill. App. 3d 289, 304 (2005).

The Act allows for both temporary and permanent maintenance awards. 750 ILCS

5/504(a) (West 2006) ("the court may grant a temporary or permanent maintenance award for either spouse"). As a general rule, "[m]aintenance is intended to be rehabilitative in nature to allow a dependent spouse to become financially independent. Permanent maintenance is appropriate, however, where a spouse is unemployable or employable only at an income substantially lower than the previous standard of living." In re Marriage of Samardzija, 365 Ill. App. 3d at 708; see also In re Marriage of Pearson, 236 Ill. App. 3d 337, 347-48 (1992). Ultimately, a maintenance award, whether it is temporary or permanent, must be reasonable (In re Marriage of Reynard, 378 Ill. App. 3d 997, 1002 (2008)) and what is reasonable depends upon the facts of each individual case (Vendredi v. Vendredi, 230 Ill. App. 3d 1061, 1067 (1992)).

On appeal, David contests not only the permanent nature of the award but also the amount of the award. We will first address his argument contesting the permanency of Donna's maintenance award. In this case, David contends that "[a]n award of permanent maintenance is appropriate only where the recipient spouse is unable to support herself" and that Donna, who has a law degree, and is a "nationally recognized law librarian" and publisher has the means to support herself.

Contrary to David's assertion, in reviewing the propriety of the trial court's permanent maintenance award, we must consider not simply whether Donna is able to support herself, but rather, whether she is able to support herself at the standard of living enjoyed by the parties during the marriage. In re Marriage of Keip, 332 Ill. App. 3d 876, 880 (2002) (recognizing that "[t]he reasonable needs of the party seeking maintenance are to be measured by the standard of living the parties enjoyed during the marriage"). Accordingly, "a permanent maintenance award

17

is justified where the spouse has employment skills but there is a discrepancy between her probable future income and the amount of income that would provide the standard of living she enjoyed while married." In re Marriage of Selinger, 351 Ill. App. 3d 611, 619 (2004). In addition, permanent maintenance is generally considered appropriate in circumstances where a spouse has devoted significant time to raising a family in lieu of pursing a career. See In re Marriage of Culp, 341 Ill. App. 3d 390, 398 (2003) ("In lengthy marriages in which the recipient of maintenance served as caregiver for the children, ' "[t]here is no question but that Illinois courts give consideration to a more permanent award of maintenance to wives who have undertaken to *** raise and support the family" ' "), quoting In re Marriage of Drury, 317 Ill. App. 3d 201, 206 (2000), quoting In re Marriage of Rubinstein, 145 Ill. App. 3d 31, 40 (1986).

In this case, there is no dispute that Donna was employed full-time as a law librarian when she married David, but that she quit working outside of the home shortly after the birth of the Heroys' second child, devoting the majority of her time to raising the children and managing the household. Although it is true that Donna did work for Alert throughout the marriage, it was only for approximately 10 hours per week and she earned only $5,000 per year. At the trial, both parties submitted expert testimony pertaining to Donna's employment prospects. Although the experts expressed disagreement over Donna's employability and the potential salary that she could earn, there is no dispute that Donna would be unable to support herself at the "lavish" lifestyle that the trial court found the Heroys enjoyed during their 26-year marriage. Indeed, the trial court found that "[e]ven assuming that Donna could earn over $100,000, as opined by

18

David's experts, her income and assets are not sufficient to approximate her standard of living during the marriage." The record supports these findings and, accordingly, we do not find that the trial court abused its discretion in awarding Donna permanent maintenance.

David, however, also disputes the amount of the maintenance award ordered by the trial court. Specifically, he contends that the trial court failed to properly consider and apply the relevant statutory factors and instead erroneously relied on the testimony of Donna's expert, who overestimated Donna's needs, in awarding Donna $35,000 per month in maintenance.

In the trial court, both parties submitted expert testimony concerning the standard of living that the parties enjoyed during the marriage as well as Donna's reasonable monthly expenses. Both experts reviewed data pertaining the couple's expenditures from 2000 to 2003 and agreed that this period was the best one to review in order to quantify the Heroys' lifestyle. Moreover, the experts agreed that $6.3 million reflected the amount that passed through the Heroys' accounts during the relevant time period. The experts differed as to Donna's needs, however. Cathleen Belmonte-Newman, Donna's expert, prepared a report in which she concluded that Donna's reasonable expenses totaled $56,016 per month and allocated the expenses among various categories. For example, she allocated $518 per month for groceries, $788 per month for the purchase of a new car every four years, and $4,969 per month for travel expenses.

Bruce Richman, David's expert, also submitted a report, in which he concluded that Donna's reasonable expenses were only $11,547 per month. Richman also completed a rebuttal report in which he concluded that Belmonte-Newman overestimated a number of Donna's

reasonable monthly expenses. In its order, the trial court indicated that it considered the reports prepared by the parties' competing experts. Ultimately, however, the court adopted neither figure offered by the experts and, instead, found that $35,000 represented a reasonable award of monthly permanent maintenance. Nevertheless, David contends that "the trial court must have relied on [the testimony of Donna's expert]" because its ruling resulted in income to Donna four to five times [David's expert's] conclusion of her needs." He cites several examples of Newman's most "egregious" calculation errors.

David is correct that some of the estimated monthly expenses that Belmonte-Newman identified did not accord with the actual spending practices of the parties during the marriage. For example, with respect to Donna's projected travel expenses, Belmonte-Newman included three annual trips to Portland at an estimated cost of $3,600 per year even though Donna had only taken a total of seven trips to Portland over the past four years at an average cost of $400 per year. Belmonte-Newman also acknowledged that she included two annual trips to New York in her analysis at an estimated cost of $4,600 per year despite the fact that Donna had taken only four such trips in the past four years at an average cost of $600 per trip. In addition, Belmonte-Newman budgeted $788 per month to permit Donna to purchase a new car every four years despite the fact that the Heroys had kept their vehicles for 7 to 10 years during the course of their marriage before making a new purchase. Belmonte-Newman also acknowledged that some of her estimates were not based on historical data but, rather, were based on projections provided by Donna. For example, the $768 Belmonte-Newman allocated to dining, the $641 she allocated to parking, gasoline and toll expenses, and the $518 she allocated to grocery expenses were all

based on Donna's own estimates as to her projected expenses rather than any analysis of historical spending.

We note, however, that the trial court neither expressly adopted nor rejected Belmonte-Newman's or Richman's projections. Moreover, unlike Belmonte-Newman or Richman, the court did not allocate any specific monetary amounts toward specific spending categories. Accordingly, David's argument that the trial court's maintenance award was based on its acceptance of the specific amounts indicated by Belmonte-Newman regarding travel, dining, and other expenses is based on pure speculation. Moreover, we note that the trial court was not required to make any such specific findings. See In re Marriage of Reynard, 378 Ill. App. 3d 997, 1004 (2008) (recognizing that in fixing a maintenance award, the trial court is simply required to consider the factors outlined in section 504 of the Act and that "it need not make specific findings as to the reasons for its decisions"); In re Marriage of Turrell, 335 Ill. App. 3d 297, 309 (2002) (same).

In this case, the trial court's detailed order reveals that it conducted a careful analysis of the relevant factors in fixing the maintenance award. After hearing 19 days of testimony from the parties and from their retained experts and receiving countless exhibits into evidence, the trial court found that $35,000 per month represented a reasonable maintenance award. In arriving at its decision, the trial court identified the "most relevant statutory factors applicable in this case ***: the income and property, marital and non-marital, of each party (504(1)); the needs of each party (504(2)); the earning capacity of each party (504(3)); Donna's contribution to the marriage (504(4)); the standard of living established during the marriage (504(6)) and the duration of the

21

marriage (504(7))." In pertinent part, the trial court noted that the Heroys had been married for 26 years and that Donna had been largely out of the workforce for 20 years. Because Donna "devote[d] her time to raising three children and managing the Heroy household," the court found her "earning potential and employment opportunities [to be] severely limited." The court also found that Donna and David had "vastly different non-marital estates" and that "[t]he resources of the parties are sufficient for both David and Donna to have a similar standard of living as established during the marriage." The trial court's order reveals that the maintenance award was based on its analysis of the expert testimony presented by the parties as well as the relevant factors set forth in the Act. We find no abuse of discretion.

In addition to disputing the trial court's reliance on Belmonte-Newman's report, David also contends that the trial court failed to properly consider several of the factors identified in section 504 of the Act and thus abused its discretion in setting Donna's maintenance award. Specifically, David asserts that the trial court failed to properly consider the income-generating potential of Donna's property award in awarding maintenance. In particular, David notes that Donna's net property award was valued at $4,189,240, which included nearly $2.8 million in cash. He notes that the trial court made no calculation as to the potential income that Donna could generate by making sound investments.

We disagree that the court's failure to calculate the income-generating potential of Donna's property award constitutes an abuse of discretion. Section 504(a)(1) requires the trial court to consider "the income and property of each party" in ascertaining a proper maintenance award (750 ILCS 5/504(a)(1) (West 2006)). The trial court's order reflects that it did so. In

pertinent part, the trial court noted:

> "The law does not require Donna to sell assets or impair capital in order to maintain herself in a manner commensurate with the standard of living established during the marriage, particularly since David has sufficient income and assets to meet both his and Donna's needs going forward. *** *However, the court can, and has, considered the income produced from the assets she received in the division of marital assets.*"

> (Emphasis added.)

The trial court was not required to apply various rates of return and make specific findings regarding the amount of income that Donna's assets could produce. See, e.g., In re Marriage of Zeman, 198 Ill. App. 3d 722, 733 (1990) (rejecting the husband's contention that the trial court failed to consider the income potential of the wife's property based on the trial court's acknowledgment that the wife " 'has inherited substantial sums, the majority of which are income producing' " even though the trial court made no calculations); see also In re Marriage of Mittra, 114 Ill. App. 3d 627, 632 (1983) (rejecting the respondent's contention that the trial court's failure to calculate the income-generating potential of the petitioner's property evidenced a failure to appropriately consider this factor in awarding maintenance because "[t]he fact that [the trial court] did not determine with mathematical certainty the amount of return does not indicate [it] failed to consider this factor, among several, in fixing the award").

David also contends that the trial court failed to properly consider the future income that Donna would receive from retirement assets. In pertinent part, David notes that the trial court awarded Donna $963,968 in retirement assets, but failed to specifically mention Donna's access

to those assets or make specific findings as to the potential revenue that Donna could receive from those assets. We acknowledge that a trial court may consider future income from retirement benefits in determining the proper duration or amount of a maintenance award. See, e.g., In re Marriage of Claydon, 306 Ill. App. 3d 895, 904 (1999) (finding that the trial court did not abuse its discretion in fixing a six-year temporary maintenance award, in part, because the "petitioner will be able to withdraw interest income from the 401(k) assets awarded to her in approximately six years"); In re Marriage of Harding, 189 Ill. App. 3d 663, 680 (1989) (finding that the trial court did not abuse its discretion in declining to award the petitioner maintenance, in part, because she was awarded $560,000 of the respondent's defined benefits plan which earned $42,000 per year). Although the trial court did not specifically reference the future income that Donna could receive from various retirement assets, the trial court's comprehensive order reflected that it considered the income of the parties in fixing the maintenance award. We disagree that the trial court's failure to make specific findings or calculations concerning the future income she could receive from retirement assets renders the maintenance award an abuse of discretion. See Reynard, 378 Ill. App. 3d at 1004 ("Although the trial court must consider all the relevant statutory factors, it need not make specific findings as to the reasons for its decisions").

We also reject David's contention that the trial court failed to properly consider Donna's ability to generate income from employment in fixing the maintenance award. As demonstrated above in reviewing the propriety of the permanent nature of the award, the court carefully considered Donna's employment opportunities and ability to earn income in ordering David to

pay her $35,000 per month in permanent maintenance. David, however, emphasizes that "Donna is a lawyer and an accomplished law librarian," and relies on In re Marriage of Schuster, 224 Ill. App. 3d 958, 970-72 (1992), where the Second District found that the trial court's failure to award the husband rehabilitative maintenance did not constitute an abuse of discretion because he was 32 years old, possessed a law degree, and had practiced law for approximately eight years immediately preceding the divorce. We find, however, that the facts in Schuster are is readily distinguishable from the case at bar. Indeed, here Donna was 56 years old at the time the trial court entered the judgment dissolving the Heroys' marriage and had never practiced law despite the fact that she obtained a law degree. Moreover, although she was employed as a law librarian at the beginning of the marriage, she quit shortly after the birth of the couple's second daughter and has not worked as a law librarian in nearly 20 years. The trial court recognized these facts, finding:

> "At age 56, Donna has limited employment opportunities. She does not have the qualifications to return to the work force and earn sufficient income to maintain her high marital standard of living. This is due to numerous factors, including the evolution of the law librarian profession, her education and experience. The evidence shows that Donna could earn approximately $30,000 a year as a law librarian and may be able to gain skills in a few years to earn a greater salary. According to Donna's expert, Mr. Fisher, Donna may be able to earn $20,000 working at Alert. Even assuming that Donna could earn over $100,000, as opined by David's experts, her income and assets are not sufficient to approximate her standard of living during the marriage."

25

The record supports these findings and, accordingly, David's contention that the trial court failed to properly consider Donna's earning potential in fixing the maintenance award is without merit.

Finally, David contends that the trial court failed to properly consider his income and future earning capacity in determining the proper maintenance amount. We disagree. The trial court's order reflected that it carefully considered David's income. In pertinent part, the trial court noted that based on the income tax return filed in 2005, he earned $1,387,690 from Bell, Boyd and Lloyd, and that his total income, including the income he received from AWP, was in excess of $2 million. The Heroys' 2004 income tax return reflected that David's total income amounted to $1,995,675. The trial court also acknowledged the reports prepared by the parties' experts pertaining to David's income:

"Donna's expert, Allen Berger, a certified public accountant with Blackman Kallick, and David's expert, Mr. Richman, both prepared 'cash flow reports' regarding David's income for the years 2003 to 2005. Although the experts disagree as to whether certain elements of David's income constitute 'cash flow' there is essentially no disagreement with regard to the net economic benefits David receives from all sources.

As part of his rebuttal report to Mr. Berger's cash flow reports, Mr. Richman prepared an analysis of Mr. Berger's cash flow analysis. According to David's expert, for the year 2005, Mr. Berger determined that David's net cash flow was $1,565,459. Mr. Richman subtracted $268,483 from that figure arriving at a net cash flow of $1,296,976."

Ultimately, the trial court concluded that "[t]he evidence shows that David will continue to

receive substantial income" from his position at Bell, Boyd and Lloyd as well as from his various AWP assets. Although David apparently disputes the conclusions drawn by the trial court as to his true net cash flow income, we disagree that the trial court failed to properly consider David's income in fixing the maintenance award.

Based on a review of the record, we find that the trial court carefully considered the relevant factors set forth in section 504 of the Act in awarding Donna $35,000 per month in permanent maintenance. Accordingly, we find no abuse of discretion and affirm the maintenance award.

In addition to disputing the trial court's permanent maintenance award, David also contests the portion of the trial court's order awarding Donna retroactive temporary maintenance. David disputes the propriety of the award, contending that it violated prior court orders and that the trial court failed to adequately explain its rationale in finding that Donna was entitled to retroactive temporary maintenance.

The record reflects that on November 24, 2003, after initiating dissolution proceedings, Donna filed a petition for temporary support. Throughout the proceedings, the parties entered various agreed orders, which called for David to pay Donna nontaxable support in the amount of $6,000 per month. Donna's petition for temporary support, in which she requested a total of $16,000 per month in maintenance, was continued to trial. At the conclusion of the hearing, the trial court found that Donna was entitled to temporary maintenance in the amount of $4,500 per month retroactive to November 24, 2003, the date Donna filed her petition for temporary support.

David, however, disputes the award. He contends that the order contradicts prior court orders, particularly an order entered by the trial court that required Donna to be responsible for the credit card debt that she incurred (which included more than $80,000 in purchases at Nieman Marcus) during the divorce proceedings. The trial court's order refutes this contention. In its order, the trial court acknowledged an order entered on July 1, 2004, requiring Donna to be solely responsible for all future credit card purchases. The trial court found the prior order "binding" and reaffirmed that "Donna is responsible for her own credit card debt." The temporary maintenance award was based on its consideration of Donna's needs and was not entered to require the marital estate to pay off Donna's credit cards.

David, however, also contends that the trial court's award of retroactive temporary maintenance was an abuse of discretion because the trial court failed to adequately explain the basis for the award. We disagree. In ordering temporary maintenance, the court held:

> "The court listened to the testimony and analyzed the reports of both parties' financial experts, Cathleen Belmonte Newman and Bruce Richman. The court also considered the parties' testimony as to Donna's spending. Further, the statute requires that the court consider David's non-marital income. David saved over $1.3 million of claimed non-marital income during the course of the divorce proceedings. Accordingly, Donna is awarded maintenance in the amount of $4,500 per month retroactive to November 24, 2003. This is in addition to the $6,000 a month temporary support David paid to Donna during the divorce proceedings. The retroactive maintenance is taxable to Donna."

Accordingly, the trial court's order clearly reflects that its decision to award Donna retroactive

28

temporary maintenance was based on a review of the statutory factors as well as the testimony and reports of the parties' experts. It was not required to make specific findings in setting the retroactive maintenance award. See generally <u>Reynard</u>, 378 Ill. App. 3d at 1004; <u>Turrell</u>, 335 Ill. App. 3d at 309. Accordingly, we disagree that the trial court abused its discretion in awarding Donna retroactive temporary maintenance.

David, however, suggests that in the event that the trial court's retroactive temporary maintenance award is proper, the award should have been funded from the marital estate prior to the property division, rather than from David's postdivision share. We agree. The $6,000 that Donna received in temporary maintenance during the dissolution proceedings was funded by the marital estate and thus, we find that the $4,500 in monthly retroactive temporary maintenance should similarly come from the parties' marital estate. We note, however, that the trial court's order merely awarded Donna "maintenance in the amount of $4,500 per month retroactive to November 24, 2002." The trial court did not specify the source from which the retroactive temporary maintenance was to come. Accordingly, we remand to the trial court to clarify its order to reflect that Donna's temporary maintenance award should be funded by the parties' marital estate.

Next, David disputes the portion of the trial court order pertaining to distribution of marital property. Specifically, he contends that the trial court erred in awarding Donna a disproportionate share (55%) of the marital estate.

Section 503 of the Act governs the distribution of marital property and directs courts to consider various factors and distribute marital property "in just proportions" to the spouses. 750

ILCS 5/503(d) (West 2006). These factors include:

"(1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the dissipation by each party of the marital or non-marital property;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any antenuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d) (West 2006).

As with maintenance awards, decisions concerning the distribution of marital property lie within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. In re Marriage of Joynt, 375 Ill. App. 3d 817, 822 (2007). The Act does not require that property be distributed with mathematical equality; rather, "[t]he touchstone of proper apportionment is whether it is equitable in nature." In re Marriage of Drury, 317 Ill. App. 3d 201, 211 (2000). Accordingly, depending upon the circumstances of the case "an unequal division of [marital] property may *** be appropriate." In re Marriage of Kristie, 156 Ill. App. 3d 821, 825 (1987).

In this case, David contends that the trial court failed to properly consider the factor specified in section 503(d)(1)– "the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property"(750 ILCS 5/503(d)(1) (West 2006))– in setting the property distribution award. Specifically, David asserts that the trial court abused its discretion in awarding Donna a greater share of the marital property because his "contribution to the acquisition, preservation, and increase in value of the parties' marital property was extraordinary." In pertinent part, he notes that he earned 99% of the family's income since 1987 and contributed $11.9 million from his nonmarital estate. He also contends that his extraordinary efforts resulted in the sale of the couple's marital home at a price that was

more than $1 million higher than the prior sale offers entertained by Donna and her realtor during the court proceedings. In contrast, he contends that "[t]he record unambiguously demonstrates that Donna's marital contributions were not extraordinary."

We agree that David made significant financial contributions to the Heroys' marital estate. However, we note that a party's "financial contribution to the acquisition of marital assets is only one of several factors to be considered by the trial court in determining the equitable distribution of marital assets." In re Marriage of Lee, 246 Ill. App. 3d 628, 638 (1993) (rejecting the husband's claim that the trial court abused its discretion in awarding the wife a greater percentage of the marital assets simply because he made a greater financial contribution to the acquisition of the assets). Although a party's greater financial contribution may support a disproportionate property award in favor of the contributing spouse (see, e.g., In re Marriage of Jones, 187 Ill. App. 3d 206 (1989); In re Marriage of Guntren, 141 Ill. App. 3d 1 (1986)), "a spouse's greater financial contributions do not necessarily entitle him or her to a greater share of the marital assets" (In re Marriage of Scoville, 233 Ill. App. 3d 746, 758 (1992)). Indeed, "[i]n a long-term marriage, the source of the assets in acquiring marital property becomes less of a factor, and a spouse's role as homemaker becomes greater." Scoville, 233 Ill. App. 3d at 758.

Here, while David's significant financial contribution weighs strongly in his favor, other factors favor Donna. As the trial court observed, Donna meaningfully contributed to the family unit during the Heroys' 26-year marriage. She devoted the majority of her time to raising their three children and played an integral part in their educational and social lives. She also contributed meaningfully as David's spouse by managing the household and entertaining his

business associates. At the time of the hearing, Donna was 56 years old and had not worked full-time outside of the house for approximately 20 years. The trial court's order reflects that it carefully considered the factors outlined in section 503 of the Act, including the contribution of the parties, in setting the property distribution award. Accordingly, although David was the primary economic provider during the duration of their marriage, we cannot conclude that the trial court's order awarding Donna 55% of the marital estate constitutes an abuse of discretion.

David, however, also disputes the property distribution award because "[Donna's] disproportionate share of the marital estate was not in lieu of maintenance." Initially, we note that the Act provides that in distributing the marital property, the trial court is required to consider "whether the apportionment is in lieu of or in addition to maintenance "(750 ILCS 5/503(d)(10) (West 2006)). Accordingly, the Act in no way precludes a trial court from awarding a spouse both maintenance and marital property; rather, it merely requires the court to consider maintenance when equitably distributing marital property. See Jones, 187 Ill. App. 3d at 223 (recognizing that pursuant to the terms of the Act, "[t]he trial court *** is authorized to award either property or maintenance, both property and maintenance, or property in lieu of maintenance"). Moreover, we note that courts have rejected claims that the trial court abused its discretion in awarding one spouse both permanent maintenance as well as a disproportionate share of the marital estate. See, e.g., Kristie, 156 Ill. App. 3d at 823-25 (upholding a trial court order awarding the wife permanent maintenance and 65% of the net equity in the marital home, the "only substantial asset owned by the parties"); see also In re Marriage of Mayhall, 311 Ill. App. 3d 765, 767-70 (2000) (affirming a trial court order awarding the wife permanent

maintenance as well as a larger share of the marital estate). Accordingly, we disagree that the trial court's order providing Donna with a larger share of the couple's marital estate constitutes an abuse of discretion.

David also contends that the trial court made various valuation and calculation errors in dividing the Heroys' marital property, thus "shorting David approximately $274,810 in his marital property award."

In a marriage dissolution action, it is the burden of both parties to provide the trial court with sufficient evidence to evaluate and distribute marital property. In re Marriage of Blackstone, 288 Ill. App. 3d 905, 910 (1997); In re Marriage of Albrecht, 266 Ill. App. 3d 399, 402 (1994). It is the responsibility of the trial court to resolve conflicting testimony concerning the valuation of marital assets. In re Marriage of Schneider, 214 Ill. 2d 152, 171 (2005); In re Marriage of Reppen-Sonneson, 299 Ill. App. 3d 691, 693 (1998). Generally, as long as the "trial court's valuation of marital assets is within the range testified to by expert witnesses, it will not ordinarily be disturbed on appeal." Blackstone, 288 Ill. App. 3d at 910; see also In re Marriage of Cutler, 334 Ill. App. 3d 731, 736-37 (2002) (recognizing that "[c]ourts of review have found it acceptable for a trial court to select a valuation between opposing values in evidence when a record contains conflicting evidence on the valuation"). We will not reverse a trial court's value determination unless it is against the manifest weight of the evidence. In re Marriage of Wojcik, 362 Ill. App. 3d 144, 151-52 (2005); Cutler, 334 Ill. App. 3d at 736. A decision is considered to be against the manifest weight of the evidence "where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence."

1-07-0308

In re Marriage of Matchen, 372 Ill. App. 3d 937, 946 (2007).

David first contends that the trial court undervalued Alert and its $145,000 shareholder loan.

In the trial court, both parties submitted reports completed by their retained experts pertaining to the value of Alert, which had an outstanding shareholder's loan of $145,000. Neal Fisher, Donna's retained expert, prepared a report certified in accordance with the Uniform Standards of Professional Appraisal practice, in which he concluded that Alert had no value. Wendy Sharon, David's retained valuation expert, submitted a contrary report, which was not certified in accordance with the Uniform Standards of Professional Appraisal Practice, in which she concluded that Alert's value ranged from $74,000 to $103,000. In its order, the trial court found: "Both parties agree that the shareholder loan of $145,000 should not be considered either an asset or liability of the marital estate." The trial court further found Sharon's valuation to be "flawed" and Fisher's valuation to be "reliable and credible" and, accordingly, found that Alert had a value of $0.

On appeal, David contends, and Donna does not dispute, that the parties never agreed that the $145,000 Alert shareholder loan should not be considered an asset or a liability of the marital estate. Accordingly, we agree that the trial court erred in making this finding; however, we deem this error harmless because the experts took the loan into account in providing their valuation reports. Indeed, David does not dispute the trial court's finding that Sharon's valuation report was "flawed," nor does he provide any argument as to what he perceives to be the correct value of Alert. Rather, he simply contends that the trial court "should have attributed at least some

35

value to the business due to the yearly deductions" that Alert permitted the Heroys to take on their income tax returns. Initially, we note that "there are *** no precise rules for fairly evaluating *** businesses" and acknowledge that a business without an established market value "may, nevertheless, possess an ascertainable value with respect to the division of marital property" (Blackstone, 288 Ill. App. 3d at 913); however, David provides no argument and cites to no evidence as to the value the trial court should have ascribed to Alert due the tax benefits it provided to the Heroys during their marriage. Because it is within the province of the trial court to resolve conflicting testimony concerning the value of marital assets (Schneider, 214 Ill. 2d at 171) and because David failed to adequately argue this issue on appeal, we do not find that the trial court's valuation of Alert was against the manifest weight of the evidence.

Moreover, assuming arguendo that the trial court erred in finding that Alert had no value, we would deem the error harmless in light of the court's distribution of the Heroys' marital estate valued at approximately $8.7 million. See, e.g., In re Marriage of Toole, 273 Ill. App. 3d 607, 617 (1995) (finding that although the trial court committed a $11,000 valuation error, it "did not constitute prejudicial error in light of the trial court's entire distribution scheme of the estate otherwise valued at $136,503"); In re Marriage of Weinstein, 128 Ill. App. 3d 234, 248 (1984) (finding that although the trial court may have committed a valuation error amounting to $4,300, the error was harmless because the estate was valued at $115,000 and the error "was *** roughly one-fortieth of the total estate. This amount was an insignificant portion of the total marital property accumulated by the parties during their marriage, and had no special effect on the trial court's distribution of the estate").

David also contends that the trial court erred in valuing his nonmarital estate. In particular, David contends that the trial court overvalued his interest in his AWP real estate holdings and AWP stock.

In the trial court, the parties stipulated that the total value of the AWP real estate was $2,130,000, of which David owns 50% ($1,065,000), and that David had a personal mortgage debt against the property amounting to $599,796. Both parties submitted written reports created by their retained valuation experts pertaining to valuation of David's interest in AWP real estate and stock. David's expert, Wendy Sharon, opined that David's AWP real estate interest was valued at $33,879, applying a 40.5% discount rate for lack of control. Neal Fisher, Donna's expert, applied a discount rate of 17% for lack of control and marketability and opined that the value of David's interest in AWP real estate was $383,794. The trial court found Fischer's overall analysis to be "credible" because his analysis, unlike the analysis performed by Sharon, recognized that the cash flow generated by the real estate was critical in applying a discount. However, the trial court determined that Fischer should have taken an additional 12.5% discount for lack of control, and upon applying the total 30% discount, found that David's real estate interest was valued at $325,642.80, explaining "David's 50% interest of $1,065,000, minus his debt of $599,796, which equals $465,204 minus the 30% discount of $139,561.20."

David does not contest the trial court's finding concerning the propriety of a 30% discount; however, he contends that the court erred in applying the discount. Specifically, David asserts that the court should have applied the discount to his interest first and then subtracted the debt, which would have resulted in a correct valuation of $145,704. He contends that the

discount should have been applied first because "the debt was 100% David's personal debt."

David, however, does not provide any authority to support his contention as to the proper manner in which to apply a discount. See 210 Ill. 2d R. 341(h)(7) (requiring the appellant to support the arguments that he raises on appeal "with citation of the authorities *** relied upon"); In re Marriage of Bates, 212 Ill. 2d 489, 517 (2004) (recognizing that "[a] reviewing court is entitled to have issues clearly defined with relevant authority cited"). Moreover, the trial court's order reflects that it considered and rejected this argument in determining the proper valuation of David's AWP real estate holdings, explaining: "[W]hile the debt may technically be with full financial recourse, the debt is secured by real estate and guaranteed by AWP, the lessee. Since the equity in the property is substantially greater than the debt, there is no basis to apply the discounts before the debt."

Accordingly, because David failed to properly develop and support his argument and because the trial court's valuation falls between the values ascribed to David's real estate interest by the parties' competing experts, we do not conclude that the court's determination as to the value of David's interest in the AWP real estate was against the manifest weight of the evidence. See In re Marriage of Reppen-Sonneson, 299 Ill. App. 3d 691, 693 (1998) ("Any conflicts in testimony regarding the value of marital assets are matters for the trier of fact, and a valuation within the range testified to by the parties' experts will not be disturbed on review").

David also contends that the trial court also erred when it overvalued his stock interest in AWP.

In addition to valuing David's interest in AWP real estate, the reports prepared by

Donna's and David's retained financial experts also assigned values to David's minority stock interest in AWP. Donna's expert valued AWP's stock at $48.56 per share as of December 31, 2005, and found that the total value of David's shares was $2,089,760, while David's expert determined that the value of AWP stock as of January 1, 2005, was $33.51 per share and that the total value of David's shares amounted to $1,514,000. The trial court found the analysis performed by David's expert to be flawed because she operated under the assumption that AWP would distribute only 60% of its earnings even though "AWP has historically distributed far in excess of its 60% of its earnings. In fact, over the six year period from 2000 through 2005, the company distributed over 100% of its earnings." In addition, the trial court found it notable that Sharon had evaluated AWP stock three years earlier when David's father passed away and had ascribed a value of $48.56 per share. In contrast, the trial court found Donna's expert's valuation determination to be "credible" and adopted Fisher's conclusion that "the value of David's AWP stock is $46.25 per share, for a total value of $2,089.760."

David, however, contends that the trial court erred in adopting Donna's expert's conclusions. Specifically, David contends the court ignored the fact that AWP's distributions have declined by 50% in the 10 years preceding the divorce even though it had distributed far in excess of 60% of its earnings and "ignored record evidence reflecting a pronounced downward trend in AWP's income in recent years." We disagree. The record reveals that the trial court thoroughly examined the competing reports prepared by the experts retained by both parties and found Donna's expert to be more "credible." Because the trial court is in the best position to resolve any conflicts in testimony pertaining to the value of a marital asset, and because it

adopted a value that was within the range testified to by the parties' experts, we do not find the trial court's valuation of David's interest in AWP stock to be against the manifest weight of the evidence. Reppen-Sonneson, 299 Ill. App. 3d at 693.

David also contends that the trial court miscalculated advances from the marital estate, thus "shorting David at least an additional $209,560." Specifically, he asserts that the trial court miscalculated monies that David advanced to the marital estate to pay for attorney fees, Donna's credit card debt, and household expenses. We first address the David's arguments pertaining to attorney fees. Specifically, David contends that when the trial court allocated 55% of the marital debt to him, the trial court mistakenly required David to contribute $184,264.31 to Donna's attorney fees because the debt was incurred by the parties during the divorce proceedings to pay for their attorney fees.

Generally, it is the responsibility of the party who incurred attorney fees to pay for those fees. In re Marriage of Nesbitt, 377 Ill. App. 3d 649, 656 (2007). Section 508 of the Act, however, provides for attorney fee awards in circumstances where one party lacks financial resources and the other has the ability to pay. 750 ILCS 5/508 (West 2006); Schneider, 214 Ill. 2d at 174. It is the party seeking contribution toward her attorney fees who bears the burden of showing her insufficient financial resources and her spouse's ability to pay. Schneider, 214 Ill. 2d at 174.

In this case, both parties filed petitions for contribution to attorney fees in the trial court. The trial court found that David and Donna had incurred over $2.2 million in attorney fees. After reviewing the pertinent factors outlined in the Act pertaining to attorney fee contribution, the trial

court ordered that "each party is responsible for his/her own fees." David, however, contends that "[w]hen the [trial] court allocated 55% of certain marital debt to David, *** it apparently forgot that this same debt was incurred by the parties during the divorce proceedings to pay attorneys fees." We agree.

The record contains various interim award orders entered during the divorce proceedings that allowed the parties to take advances from the marital estate to pay their legal fees and other expenses. For example, on April 27, 2004, the court ordered David to sell the parties' wine collection and use the proceeds to pay his attorneys $105,000 and Donna's attorneys $221,000, the payments to be considered "advances from the parties' marital estate without prejudice to final allocation and without prejudice as to any claim or right of either party." By agreed order, dated May 14, 2004, the court modified the April 27, 2004, order and permitted David to "borrow funds to satisfy his obligations pursuant to the April 27, 2004, Order." On April 20, 2005, the court ordered David to pay Donna's attorneys $190,000, and allowed him to borrow money to pay the fees. Again, the payment was to be "deemed an advance to Donna from the parties' marital estate without prejudice to final allocation and without prejudice to any claim or right of either party." On April 7, 2006, David was ordered to "extend the line of credit at the Northern Trust secured by the parties' coop located at 2450 N. Lakeview, Chicago, Illinois, by $400,000" to pay for Donna's interim attorney fees, the payment to be "deemed an advance to Donna from the parties' marital estate without prejudice to final allocation and without prejudice to any claim or right of either party."

Although the parties borrowed funds to pay for other costs in addition to attorney fees,

there is no dispute that some of the debt incurred by the parties during their dissolution proceeding includes money borrowed to pay for their respective attorney fees and costs. By failing to account for the portion of the debt associated with attorney fees and costs prior to allocating a disproportionate share of the debt to David, the court inadvertently required David to contribute to Donna's attorney fees, in contravention of its express order that the parties be responsible for their own fees. Donna does not contend nor does the record establish that she is unable to pay for her attorney fees. See Schneider, 214 Ill. 2d at 174-75 (recognizing that an attorney fee award is improper absent evidence of inability to pay). Accordingly, David is entitled to a credit toward the portion of the marital debt encompassed by Donna's attorney fees. Because the record is unclear as to portion of the marital debt that is related to the parties' attorney fees and costs, we remand this matter to the trial court with directions to determine the portion of the debt encompassed by Donna's attorney fees and to credit David accordingly.

David also contends and Donna does not dispute that the trial court erred in failing to account for a $56,213 payment advanced by David to Donna pursuant to court order during the divorce proceedings in calculating and distributing marital advances. The record reflects that on July 1, 2004, David agreed to pay Donna $56,213 as an advance from the marital estate to allow her to pay her credit card bills. David contends that "[i]n its spread regarding the distribution of property *** the trial judge mistakenly overlooked the $56,213 paid as an advance to Donna, shorting David an additional $25,296." Donna does not dispute David's argument and, accordingly, we thus agree that David is entitled to a $25,296 credit.

David also contends that he is entitled to a credit for the household expenses he assumed

responsibility for during the pendency of the divorce. Specifically, he notes that the trial court ordered him to pay the expenses associated with the couple's 2450 Lakeview home and Michigan house throughout the divorce proceedings and argues he is entitled to a credit for those expenses. David, however, fails to cite any relevant authority that such a credit is required and fails to indicate the value of the credit to which he feels he is entitled. 210 Ill. 2d R. 341(h)(7). Because he failed to properly support and develop this argument, we find no credit is required.

For the foregoing reasons, we affirm the trial court's order awarding Donna a disproportionate share of the marital property. We, do however, modify the portion of the trial court's order pertaining to the allocation of marital debt. The trial court ordered the parties to be responsible for their own attorney fees, and, accordingly, David is entitled to a credit toward the portion of the debt which encompassed Donna's attorney fees. Because the record is unclear as to the portion of the marital debt that is associated with the attorney fees and costs incurred by the parties during their dissolution action, we remand to the trial court. On remand, the trial court is directed to determine portion of marital debt encompassed by Donna's attorney fees and calculate the appropriate credit. We also find that David is also entitled to a credit of $25,296 for money that he advanced to the marital estate pursuant to court order to allow Donna to meet her credit card obligations.

We now address the arguments that Donna has raised on cross-appeal. Donna contests various summary judgment orders entered by the trial court prior to trial, finding that various assets were David's nonmarital property. Donna first contends that the trial court erred in finding that David's AWP real estate interests, which he acquired during the marriage, constituted

43

nonmarital property.

Summary judgment is appropriately granted where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2006). "The mere suggestion that a genuine issue of material fact exists without supporting documentation does not create an issue of material fact precluding summary judgment." In re Marriage of Palacios, 275 Ill. App. 3d 561, 568 (1995).

As a general rule, in a marriage dissolution action, the trial court's classification of property as marital or nonmarital will not be reversed on appeal unless we can conclude that it was against the manifest weight of the evidence. Joynt, 375 Ill. App. 3d at 819; In re Marriage of Berger, 357 Ill. App. 3d 651, 659-60 (2005). A decision is said to be against the manifest weight of the evidence only where "the opposite conclusion is clearly evident or where it is unreasonable, arbitrary, and not based on the evidence." Berger, 357 Ill. App. 3d at 660.

Section 503(b)(1) of the Act provides: "[A]ll property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage, including nonmarital property transferred into some form of co-ownership between the spouses, is presumed to be marital property ***." 750 ILCS 5/503(b)(1) (West 2004). The Act thus creates a rebuttable presumption that all property acquired after the date of the marriage is marital property regardless of the manner in which title is held. In re Marriage of Didier, 318 Ill. App. 3d 253, 258 (2000); see also In re Marriage of Parr, 103 Ill. App. 3d 199, 205 (1981) (recognizing that the Act has an "express preference for the classification of property as marital

property"). Accordingly, it is the burden of the party claiming that property acquired during the marriage is nonmarital to prove by clear and convincing evidence that the property falls within one of the exceptions listed in section 503(a) of the Act. In re Marriage of Wanstreet, 364 Ill. App. 3d 729, 735 (2006); Didier, 318 Ill. App. 3d at 258. Pursuant to section 503(a)(2) of the Act, "property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy, or descent" is considered nonmarital property. 750 ILCS 5/503(a)(2) (West 2006). Ultimately, " '[a]ny doubts as to the nature of the property are resolved in favor of finding that the property is marital.' " Didier, 318 Ill. App. 3d at 258, quoting In re Marriage of Hegge, 285 Ill. App. 3d 138, 141 (1996).

In this case, the parties do not dispute that David acquired real estate located at 803 Wohlert Street in Indiana after the marriage. Accordingly, the parties agree that, based on the date of their marriage and the acquisition of the property, section 503(b)(1) of the Act created a rebuttable presumption that the 803 Wohlert Street property was marital property, and it was David's burden to prove by clear and convincing evidence that the property fell within one of the exceptions outlined in section 503(a) of the Act. David contends that he satisfied this burden and that summary judgment was properly granted. Specifically, he maintains that the property is nonmarital because it was property acquired during the marriage in exchange for other nonmarital property and, accordingly, the exception outlined in section 503(a)(2) of the Act applies.

The underlying facts are not in dispute. In 1967 David's parents purchased several acres of industrial property located in Angola, Indiana, to use as a manufacturing facility for AWP.

Donna and David married in 1980. Thereafter, on July 1, 1981, David and his brother Michael entered into an agreement with their parents to purchase property located at 803 Wohlert Street in exchange for a note. The purchase price was $600,000, to be paid in monthly installments of $6,000 with the note accruing interest at a rate of 9% annually. David and Michael made no down payment in purchasing the property. Thereafter, they used the rental income generated by the property to satisfy the $6,000 monthly payment obligations. During their marriage, the Heroys had a joint marital checking account, into which David deposited earnings from his law practice as well as income generated from AWP, including rental proceeds. The rental proceeds that were deposited into the Heroys' joint checking account were then used to meet David's $6,000 monthly payment obligations. During the marriage, David and his brother obtained various loans, using the AWP property as collateral, and the loans were repaid using AWP proceeds.

Initially, the parties dispute whether the exception outlined in section 503(a)(2) applies. Specifically, they dispute whether David acquired the AWP real estate through the exchange of nonmarital property.

Donna relies on In re Marriage of Agazim, 147 Ill. App. 3d 646 (1986). In that case, the wife and her sister contracted to purchase real estate from their father at a price reflecting the fair market value of the property. The sisters put no funds toward the purchase price; rather, rental proceeds collected from the property were used to satisfy the purchase price and other monetary obligations. The trial court classified the property as nonmarital, finding that it was gift. On appeal, the Second District rejected the trial court's classification, noting that the property

transfer was not gratuitous, rather there was a contract for sale of the property. Specifically, the court rejected the wife's contention that there was no consideration, finding that she was "paying for the property out of the rental proceeds." Agazim, 147 Ill. App. 3d at 649. Accordingly, the Second District found that the trial court erred in classifying the property as a gift and nonmarital asset and reversed the trial court's order.

Donna contends that, like the wife and her sister in Agazim, David and his brother formed a purchase contract and then "used the money generated from the property to pay for the property." We find Donna's reliance on Agazim unpersuasive. Notably, the court was addressing whether the property was a gift, not whether it was acquired in exchange for nonmarital assets. Moreover, we disagree with Donna that the fact that the money generated from the property was used to pay for the property necessarily renders the property a marital asset. Indeed, in In re Marriage of Eddy, 210 Ill. App. 3d 450 (1991), we found that property that was paid for by the revenue it generated was actually nonmarital property.

In Eddy, the husband and his brother inherited ranch and farm property from their father during the husband's marriage. Thereafter, the husband and his brother formed a partnership that purchased three McDonald's restaurants in Florida. The husband and his brother obtained loans and a mortgage to purchase the restaurant which were secured by the property that they had inherited. Revenue generated by the restaurants was used to repay the loans. The circuit court classified the husband's partnership interests as nonmarital property and the wife appealed, arguing that "the evidence established that [her husband and his brother] borrowed all of the money needed to buy the franchises and that they did not exchange nonmarital property for the

franchises nor did they repay the loans with nonmarital property." Eddy, 210 Ill. App. 3d at 457. We disagreed, finding:

"collateral for the loans of money and the funds used to purchase the McDonald's restaurants were derived from properties [the husband] received through inheritance and as gifts. [The husband] did prove by clear and convincing evidence that the property which formed [the partnership] was nonmarital property. *Furthermore, since the McDonald's business itself repaid the loans, there was clear and convincing evidence that the assets were acquired by exchanging nonmarital property for them*." (Emphasis added.) Eddy, 210 Ill. App. 3d at 458.

In this case, David, like the husband in Eddy, acquired real estate without ever using marital income or assets to secure and repay the original and subsequent loans on the property. Indeed, David paid for the property with income generated by the property. Accordingly, we find that the exception applies and the trial court did not err in classifying the 803 Wohlert property as a nonmarital asset. Moreover, since the 803 Wohlert property was used as collateral for loans to enable David and his brother to finance additions and other improvements, those interests are also nonmarital. Eddy, 210 Ill. App. 3d at 458.

Even though no marital assets were used to pay for the AWP real estate, Donna emphasizes that the AWP rental proceeds that were used to pay off the note were deposited into the joint marital account and contends that, because "the money that David paid flowed through the parties' joint account *** [it] was marital in any event."

We acknowledge nonmarital property may be transmuted to marital property if it is

commingled with marital property. See 750 ILCS 5/503(c)(1) (West 2006) ("When marital and non-marital property are commingled by contributing one estate of property into another resulting in loss of identity of the contributed property, the classification of contributed property is transmuted to the estate receiving the contribution"). The rationale for this rule is that the spouse's "failure to properly segregate nonmarital property, by commingling it with martial property, evinces an intent to treat the former as part of the marital estate." In re Marriage of Wojcik, 362 Ill. App. 3d 144, 154 (2005).

Here, there is no dispute that David deposited AWP rental proceeds into the Heroys' joint checking account. Although the placement of nonmarital funds into a joint checking account may transmute the nonmarital funds into marital property (see In re Marriage of Emken, 86 Ill. 2d 164, 166 (1981); In re Marriage of Berger, 357 Ill. App. 3d 651 (2005)), nonmarital funds that are placed into a joint account merely as a conduit to transfer money will not be deemed to be transmuted into marital property (see Wojcik, 362 Ill. App. 3d at 155 (rejecting the husband's contention that the trial court erred in finding that the wife's car which she purchased with nonmarital funds that she placed into the couple's joint checking account prior to the purchase was nonmarital property, reasoning that "she had placed the funds in the account merely as a conduit to transfer the money"); see also In re Marriage of Miller, 231 Ill. App. 3d 480, 488 (1992) (rejecting the petitioner's contention that nonmarital funds lost their identity and should have been considered marital funds simply because they were deposited in the couple's joint checking account which contained marital funds)).

Here, although AWP rental proceeds were deposited into the Heroys' joint checking

account with marital funds, David used the proceeds to make his installment payments on the note. The placement of the funds into the couple's joint checking was simply a conduit to transfer money, which allowed David to satisfy his payment obligations. We thus disagree with Donna that the simple fact that the rental proceeds from the 803 Wohlert Street property "flowed through the parties' joint account" rendered the property a marital asset. Accordingly, we uphold the trial court's finding that the 803 Wohlert Property was a nonmarital asset.

Donna also contends that the trial court erred in finding that the funds that David had on deposit in various accounts created during the marriage were nonmarital property. She contends that because the accounts were created during the marriage, there is a presumption that the accounts are marital property and that David failed to properly rebut this presumption. We disagree.

The record shows that in 2002 David began opening various accounts in which he segregated the income that he received from various sources. Specifically, in 2002, David received $50,621 in life insurance proceeds upon his father's death. Using the money, which the parties agree is nonmarital property, David opened Northern Trust account No. 5792159 (579 Account). He subsequently transferred the life insurance proceeds to a separate account: No. 2326930. Thereafter, in January 2003, David began depositing his AWP stock distributions, also undisputed nonmarital property, into the 579 Account. In the fall of 2003, he then transferred an amount equal to the AWP stock distributions to a separate account: No. 2326922. Beginning in July 2003, David followed the same procedure with the nonmarital AWP real estate proceeds, and deposited them into the 579 Account. In January 2003, David deposited $800 per month,

which he received as a director's honorium from AWP, into the 579 Account, and in October 2003, he transferred the honorium funds to a separate account: No. 24135755. These funds were found by the trial court to be marital and divided between the parties. Finally, in July 2004, David deposited the $25,000 executor fee that he received from his father's estate into account No. 201014. The trial court also found this to be marital property and distributed it between the parties.

Donna concedes that the 579 Account, which David opened with the life insurance proceeds he received upon his father's death, was opened with nonmarital property. However, she contends that because the director's fees, which were found by the trial court to be marital property, were deposited into the 579 Account before being transferred to their own account, nonmarital assets and marital assets were commingled, transmuting all of the accounts into marital property.[1]

In support of her argument she relies on In re Marriage of Davis, 215 Ill. App. 3d 763, 769 (1991), where we found that securities acquired with marital and nonmarital funds that were commingled into one account were marital property, reasoning that "[o]nce marital and nonmarital funds are commingled and lose their identity through acquisition of a newly created

---

[1] Donna also speculates that the 579 Account also "possibly contained the executor fees received from David's father's estate," which the trial court also found to be marital property, and cites this as another example of commingling. David, however, contends that the executor fees were never deposited in the 579 Account. Donna fails to provide any citation to the record to support her speculation, and, accordingly, we deem her argument pertaining to the executor fees waived. 210 Ill. 2d R. 341(h)(7) (requiring the appellant to support her arguments that she raises on appeal "with citation of the authorities and *the pages of the record relied on*" (emphasis added)); Gomez v. Finishing Co., 369 Ill. App. 3d 711, 723 (2006) (finding waiver due to the party's failure to provide relevant citations to the record).

asset during the marriage, the asset is marital." Donna contends:

> "The same situation is presented here. The [579 Account] was presumptively marital and contained funds from both marital and non-marital sources. David used the commingled marital and non marital funds in the [579 Account] to create four new accounts. Thus, the commingled marital and non-marital funds in the [579 Account] were transmuted to marital property."

We find Donna's argument as well as her reliance on Davis unpersuasive. Unlike Davis, marital and nonmarital property were not commingled to acquire new assets "resulting in a loss of identity of the contributing estates." Davis, 215 Ill. App. 3d at 769-70. Instead, David opened the 579 Account with nonmarital assets. He deposited nonmarital income that he received from other sources into that account before segregating the funds into their own accounts. Although the $800-per-month director's honorarium, which the court did find to be marital property, was also deposited into the 579 Account for 10 months before being transferred to its own account, the trial court was able to clearly trace the proceeds and distribute the marital estate accordingly. The funds did not lose their identity and no improper commingling occurred. Accordingly, we do not find that the trial court erred in finding that the various accounts David created during the marriage with nonmarital assets were his nonmarital property.

For the foregoing reasons, we affirm as modified the judgment of the trial court and remand with directions.

Affirmed as modified; remanded with directions.

QUINN and CUNNINGHAM, JJ., concur.

52

1-07-0308