NOTICE
Decision filed 03/02/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220222-U

NO. 5-22-0222

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| MARY E. MORRIS-FOLAND, | ) | Bond County. |
| n/k/a Mary E. Morris, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 19-D-31 |
| | ) | |
| GARY FOLAND, | ) | Honorable |
| | ) | Ronald J. Foster, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Vaughan concur in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion in directing the former husband to reimburse the former wife for one-half the value of the marital home where both parties contributed to its purchase, construction, and upkeep.

¶ 2    The trial court dissolved the marriage of the respondent, Gary Foland, and the petitioner, Mary Morris-Foland, now known as Mary Morris. In an ancillary order addressing financial issues, the court awarded Gary sole possession of the marital home and ordered him to reimburse Mary for half the fair market value of the home. Gary appeals that ruling, arguing that the court abused its discretion by awarding Mary one-half the value of the parties' marital home because he asserts

1

that his financial contributions to the marital estate and to the purchase and upkeep of the parties' home were substantially greater than Mary's. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The parties were married in March 1993. At that time, Gary was 41 years old, and Mary was 52 years old. No children were born or adopted by the parties during the marriage.

¶ 5     Mary worked as a social worker from the time the parties married until 2004. After that time, she worked as a hair stylist until 2012. Gary retired from the post office in 1991 and received a civil service pension throughout the marriage. In 1995, he began receiving disability benefits due to posttraumatic stress disorder related to his service in Vietnam in the early 1970s. He also received a lump sum payment of $99,000 when his disability claim was approved, representing retroactive disability benefits for the period between 1989, when he filed his claim, through 1995, when the claim was approved.

¶ 6     During the marriage, the parties purchased a 10-acre property in Sorrento, Illinois, and built a house on it. According to Mary, she designed the house, and the parties did most of the work necessary to build the home together.

¶ 7     Both parties received money from their parents during the marriage. Gary received a gift of $72,000 from his father and Mary inherited $8000 from her father. Although the parties kept these funds in segregated accounts, they titled the accounts jointly and used the funds for marital purposes.

¶ 8     On May 16, 2019, Mary filed a petition for dissolution. On October 4, 2019, the court entered an order dissolving the parties' marriage and restoring Mary's maiden name. The court reserved jurisdiction to rule on financial matters, including maintenance and property distribution.

¶ 9    In contemplation of the court's property distribution, both parties had the marital home appraised. The appraiser hired by Gary performed an appraisal in November 2019 and determined that the value of the home was $157,000. The appraiser hired by Mary performed an appraisal in March 2021 and determined that the property was worth $182,000.

¶ 10    On January 31, 2022, the court held a hearing at which both parties testified. Gary first testified that throughout the marriage, he was retired and on disability due to suffering from posttraumatic stress disorder. He acknowledged that during the first two years of the marriage, Mary "brought in most of the money." After 1995, however, he stated that "all that swapped around" and that he became "the major money maker" for the remainder of the marriage.

¶ 11    Gary explained that he had two sources of income—a civil service annuity and disability benefits related to his military service. A financial affidavit indicated that at the time of the hearing, Gary received $1646 per month from his civil service annuity and disability benefits of $3146 per month. Gary testified that his disability claim was approved in 1995. In addition to receiving monthly payments after that date, Gary received a lump sum payment of $99,000, representing retroactive payments from 1989, when he filed his claim, until it was approved in 1995.

¶ 12    Gary further testified that during the marriage, he received a settlement of $10,000 from litigation related to his employment with the post office. Although he did not offer specifics, he noted that the litigation involved a dispute between the post office and his union over wages. Gary stated that he retired from the post office in April 1991, before he married Mary.

¶ 13    Gary also testified concerning the funds each party received from their parents during the marriage. He received a gift of $72,000 from his father, and Mary inherited approximately $9000 from her father. (We note that according to Mary, she inherited $8000. This discrepancy is not crucial to our decision.) Gary testified that his father's gift came in the form of a check that did

3

not have Mary's name on it. He acknowledged that he placed the funds into an account that was titled in both of their names, but he stated that "it was understood" that the $72,000 from his father was his alone and the inheritance from Mary's father was hers alone. Gary further testified that Mary never withdrew funds from the account with the money from his father. He testified that he spent most of the money from his father on vacations, and that he used $10,000 of it to build a beauty shop for Mary to use after she retired from her job as a social worker.

¶ 14 Finally, Gary presented a series of exhibits he prepared comparing his estimate of his own financial contributions during the marriage with his estimate of Mary's financial contributions. Although those exhibits do not appear in the record on appeal, Gary testified that his financial contributions during the marriage totaled $1,232,063. In his brief, he states that the exhibit showing Mary's contributions provided an estimated total of $300,000.

¶ 15 Mary testified concerning the parties' respective nonmonetary contributions to their marriage. She explained that she managed the couple's finances and did all the housework, while Gary took care of the yard. She stated that they shared the cooking, although she did most of it. She also testified that she designed the marital home and that both parties contributed to the physical labor involved in building it.

¶ 16 Mary further testified concerning the parties' treatment of her $8000 inheritance and the gift from Gary's father. She testified that she used the money she inherited to buy appliances and furniture for the marital home. She did not know how Gary spent the money from his father. When asked if the money from Gary's father was in a joint account, Mary replied, "I don't really remember if my name was on it or not. I don't know. I never used it." Later, she testified that all the parties' funds were in joint accounts. Her attorney asked, "You didn't keep your money

4

separate?" Mary replied, "No, never. Whatever he had in it, you know, separate, and I didn't touch that, and he didn't touch my dad's, but I paid all the bills."

¶ 17    The parties entered various exhibits into evidence, including the appraisals of the marital home and their financial affidavits. As stated previously, Gary's affidavit indicates that his income at the time of the hearing consisted of $3146 in disability benefits and $1646 from a civil service annuity for a total of $4792 per month. Mary's financial affidavit indicates that her income at the time of the hearing consisted of $2022 per month from Social Security. The court took the matter under advisement.

¶ 18    On March 11, 2022, the court entered its final order. The court awarded Mary maintenance in the amount of $569.60 per month. The court also distributed the parties' personal property. Finding that the parties no longer had any joint bank accounts, the court awarded each party the accounts in their name. The court also awarded each party their own retirement account. Finally, the court accepted the valuation provided by Mary's appraiser, thus finding the value of the home to be $182,000. The court awarded Gary sole possession of the home and ordered him to pay $91,000 to Mary for her one-half interest in the home within 90 days of its order. Gary subsequently filed this timely appeal.

¶ 19                                    II. ANALYSIS

¶ 20    Gary raises only one issue in this appeal. He contends that the court abused its discretion in awarding Mary one-half the value of the marital home. He argues that he was entitled to a larger share because his financial contributions to the marital estate in general, and the home in particular, were far more substantial than Mary's. He further contends that, because the parties did not have children, Mary did not fill a traditional homemaker role. Although it is not entirely clear, it appears that he is implicitly arguing that because the parties had no children, Mary did not make the sort

of nonmonetary contributions to the marital estate that are typically considered an important basis for treating the contributions of a lower-earning spouse as equal to the contributions of the higher-earning spouse. We are not persuaded.

¶ 21    In dissolution of marriage proceedings, courts are to divide the marital property "in just proportions." 750 ILCS 5/503(d) (West 2018). Mathematical equality is not required. Rather, the distribution must be equitable. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 34; *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 661 (2008). Although not required, an equal division of property " 'is generally favored.' " *Hamilton*, 2019 IL App (5th) 170295, ¶ 34 (quoting *In re Marriage of Minear*, 287 Ill. App. 3d 1073, 1083 (1997)). Distribution of marital property is a matter within the discretion of the trial court. We will not reverse its decision absent an abuse of that discretion. *Id.*; *Heroy*, 385 Ill. App. 3d at 661.

¶ 22    Section 503 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act), which governs the distribution of marital property, provides a list of factors courts should consider in determining how to equitably divide the property. Among those factors is the one Gary emphasizes here: "each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property." 750 ILCS 5/503(d)(1) (West 2018).

¶ 23    Before addressing Gary's contention that this factor entitles him to a larger share of the marital property, we note that the record before us does not contain any information on the relative value of other assets divided between the parties, and it contains little evidence concerning the precise contributions made by each party during the marriage—both financially and otherwise. Because Gary is the appellant in this matter, it was his obligation to provide us with a record adequate to resolve his claims. Any doubt created by gaps in the record must therefore be resolved against him. *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 655

6

(2007). Nevertheless, Mary acknowledges that Gary's financial contributions were more substantial than hers, and the record appears to support this. Gary's current retirement income is more than double Mary's, and while both parties contributed funds from nonmarital sources (see 750 ILCS 5/503(a)(1) (West 2018) (providing that property acquired during the marriage by gift, legacy, or descent is nonmarital property)), Gary had more nonmarital property to contribute. We therefore turn our attention to the merits of Gary's argument that because of these financial contributions, the court abused its discretion by not awarding him "the lion's share" of the marital property.

¶ 24     Gary is correct in noting that a party's disproportionate financial contributions *can* be a factor that makes an unequal distribution of property equitable. See, *e.g.*, *In re Marriage of Guntren*, 141 Ill. App. 3d 1, 5 (1986) (affirming a trial court's unequal property distribution where the wife "made large, traceable cash contributions toward property acquired during the marriage"); *Stallings v. Stallings*, 75 Ill. App. 3d 96, 100 (1979) (upholding an award of most of the marital property to the wife where she was the primary earner and also had primary responsibility for taking care of the couple's children and home and where there was evidence of dissipation of marital property by the husband). He also correctly notes that the Marriage Act incorporates a "partnership theory" of marriage. See *In re Marriage of Smith*, 86 Ill. 2d 518, 529 (1981); *In re Marriage of Goforth*, 121 Ill. App. 3d 673, 678 (1984). Gary acknowledges that because of this partnership theory, the Marriage Act requires trial courts to consider a spouse's nonmonetary contributions to the marriage, particularly those of a spouse who acts as a homemaker. See *Smith*, 86 Ill. 2d at 529 (explaining that part of the intent of section 503 of the Marriage Act was "to recognize and compensate the homemaker as an equal partner"). He contends, however, that

7

because the parties did not have children, Mary did not fulfill the traditional role of a homemaker and that, as such, this principle does not apply. This contention is without merit.

¶ 25    There are three flaws in Gary's argument. First, although Mary did not forgo a career to care for children or to be a full-time homemaker, she offered undisputed testimony that she did all the housework and most of the cooking and that she paid the couple's bills. Thus, she did much of the work of a traditional homemaker in addition to working outside the home.

¶ 26    Second, and more importantly, we reject the notion that the court was required to ignore Mary's significant contributions to the marriage because she worked outside the home and the parties did not have children together. In addition to working until she was in her 70s, cooking, doing housework, and paying the couple's bills, Mary designed and helped build the marital home. Nothing in either the express statutory language or the cases cited by Gary supports his contention that these efforts should not be recognized by the court. See 750 ILCS 5/503(d)(1)(ii) (West 2018) (stating that one factor to consider is the contributions of each party to the acquisition and preservation of marital property, including "the contribution of a spouse as a homemaker *or to the family unit*" (emphasis added)); *In re Marriage of Aschwanden*, 82 Ill. 2d 31, 37 (1980) (stating that courts must "consider contributions of a spouse as a homemaker *or to the family*" (emphasis added)). Indeed, as the Illinois Supreme Court has explained, "the intent of section 503 as a whole was designed to eliminate the disparity between the marriage partners." *Smith*, 86 Ill. 2d at 529-30.

¶ 27    The third flaw in Gary's argument is that while a party's financial contribution to the acquisition and preservation of marital assets is a factor to be considered, it is only one of the many factors the court must consider. *Heroy*, 385 Ill. App. 3d at 661. A party's more substantial financial contributions do not necessarily entitle that party to a larger share of the marital property,

8

especially in a lengthy marriage such as the one between the parties in this case. *Id.* at 662. Other pertinent factors include the duration of the marriage (750 ILCS 5/503(d)(4) (West 2018)); the relevant circumstances of each party (*id.* § 503(d)(5)); the age and health of the parties, their employability, the amount, and sources of income of each party, and the needs of the parties (*id.* § 503(d)(8)); and the reasonable opportunity for each party to acquire income and assets in the future (*id.* § 503(d)(11)). Here, the parties had a lengthy marriage of 26 years. Both parties are retired with little to no opportunity to acquire additional income or property. However, Gary's income is significantly higher than Mary's, even after payment of maintenance. While Gary's substantial financial contributions—particularly his contribution of nonmarital funds—is a factor that does weigh in his favor, the remaining factors favor an equal distribution. We find no abuse of the court's discretion.

¶ 28                                    III. CONCLUSION

¶ 29    For the foregoing reasons, we affirm the trial court's judgment.

¶ 30    Affirmed.