2023 IL App (1st) 220103-U

FIRST DISTRICT,
FIRST DIVISION
October 16, 2023

No. 1-22-0103

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN RE MARRIAGE OF: | ) ) | Appeal from the |
| ILONA A. NEIS, | ) ) | Circuit Court of Cook County, Illinois. |
| Petitioner-Appellee, | ) ) | No. 2017 D 6010 |
| v. | ) ) | |
| JAMES M. NEIS, | ) ) ) | Honorable Lori Rosen, Judge Presiding. |
| Respondent-Appellant. | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court's classification of certain assets as nonmarital property was not against the manifest weight of the evidence. Trial court's directive as to the source of retroactive spousal maintenance was not clear. For the forgoing reasons, we affirm the trial court's judgment of dissolution of marriage and remand with directions.

¶ 2    The instant appeal arises from the trial court's entry of a judgment of dissolution of marriage. Respondent James M. Neis appeals from the trial court's classification of certain property as non-marital and its order awarding retroactive temporary maintenance to petitioner

Ilona S. Neis. For the reasons that follow, we affirm the judgment of the trial court and remand with directions.

¶ 3                              BACKGROUND

¶ 4       Ilona and James were married on March 16, 1968, and had one child during the course of their marriage.

¶ 5       On July 11, 2017, Ilona filed a petition for dissolution of marriage alleging irreconcilable differences. According to the petition, James was 71 years old and "gainfully employed as an attorney" and Ilona was a 68-year-old homemaker.

¶ 6       On December 21, 2017, the trial court entered an order awarding Ilona $9,000 per month in temporary maintenance from James and reserved the issue of retroactive maintenance for trial. On September 9, 2019, the trial court reduced James's temporary maintenance obligation to $4,600 per month and allowed James to "withdraw funds from his retirement" to "the extent necessary" to satisfy the maintenance obligation, up to $120,000. On November 7, 2019, the trial court vacated the September 9th order and authorized James to withdraw $350,000 in retirement funds.

¶ 7       Between March 2, 2018, and February 16, 2021, Ilona filed seven petitions for rules to show cause why James should not be held in indirect civil contempt for failing to pay court-ordered maintenance. On March 16, 2021, James filed a petition to terminate his maintenance obligation due to his retirement and "precarious" health. Ilona's eighth and ninth Petitions for Rule were filed on August 17, 2021, and September 27, 2021. The trial court ordered that Ilona's last two petitions and James's petition to terminate maintenance would be addressed at trial.

¶ 8       The dissolution trial began on October 4, 2021. Ilona testified that she opened various brokerage accounts during the marriage for the purpose of trading securities. Ilona's father died on December 25, 2009, and her mother died February 4, 2015. Ilona opened Northern Trust

brokerage account number 3511 (NT Account) with inheritance funds from her mother and father. Ilona gave conflicting testimony regarding the date on which the account was opened, but the parties agree that the account was established during the marriage.

¶ 9        A statement from Northern Trust indicated that the NT Account had a total value of $120,825.33 on January 1, 2014. The account was made up entirely of a fixed income security: 11,314.124 shares of the "PIMCO Total Return Class A" (PIMCO) mutual fund. Ilona could not remember the source of these assets. Although there were no additions to or withdrawals from the account in 2014, the account grew to 11,808.285 PIMCO shares with a value of $125,876.32 by the end of the year. Ilona does not challenge the trial court's classification of the initial balance of the assets in the NT Account as marital.

¶ 10        Northern Trust and Ilona were nominated as administrators of the estate of Ilona's mother, Vilma Somogyi. Michael Garlington, a senior estate administrator employed by Northern Trust, was the administrator assigned to manage Vilma's estate. Following the death of Ilona's father, John Somogyi, on December 25, 2009, Northern Trust held and administered two trusts: John's Trust A and John's Trust B. Vilma was the lifetime beneficiary of both trusts, but the funds in John's Trust B were to be distributed to Ilona and her sister upon Vilma's death. After Vilma died on February 4, 2015, the assets in John's Trust A were to be distributed to her own irrevocable trust ("Vilma's Trust") and the assets in John's Trust B were to be distributed equally to Ilona and her sister. Northern Trust created a plan of division for John's Trust A, John's Trust B, and Vilma's Trust. Garlington explained that a plan of division is "a detailed listing of the assets that are then to be distributed with a distribution plan" in which "beneficiaries [are] shown as to what percentage of the listed assets they are to receive."

¶ 11     The plan of division established on May 22, 2015, equally distributed the assets of John's Trust B directly to Ilona and her sister. Ilona's share of the distribution was valued at $194,174.94. In August 2015, Ilona transferred $70,518.04 worth of securities and $10,017.75 in cash to the NT Account. In September 2015, Ilona transferred $107,492.25 in securities and $291.38 in cash to the NT account. In December 2015, Ilona transferred $108.57 into the NT account.

¶ 12     The plan of division established on August 4, 2016, allowed for the assets in Vilma's Trust to be equally distributed to Ilona and her sister. Ilona's share of the distributed assets was valued at $1,712,149.98. That same month, Ilona transferred $1,357,596.99 in securities from Vilma's Trust to the NT account.

¶ 13     In September 2016, Ilona transferred $29.55 in inheritance funds to the NT account. On October 28, 2016, Ilona transferred $104,144.10 in securities and $302,695.25 in cash from inheritance funds to the NT Account. Garlington testified that this was the final distribution made to the NT Account. In total, Ilona transferred $1,952,893.98 of inheritance funds to the NT Account. Garlington did not identify specific securities that were transferred to the NT Account.

¶ 14     Between November 2016 and June 2021, Ilona withdrew assets from the NT Account as follows: $21,956.74 in November 2016; $138,345.87 in 2017; $55,174.05 in 2018; $36,480.69 in 2019; and $180,000 in 2021. On June 30, 2021, the NT Account had a total value of $2,716,078.45.

¶ 15     On December 28, 2021, the trial court entered a judgment for dissolution of marriage. The trial court found that Ilona had opened the NT Account during the marriage with marital funds, totaling $125,876.32 as of January 2015. The court also found, in relevant part:

"Ilona's testimony regarding her intentions as well as the timing and amounts of her transfers of her nonmarital property, supported by Mr. Garlington's testimony, brokerage account statements, and the transaction report, establishes by clear and convincing

evidence that the transfers amounting to $1,952,893.9[8] to [the NT Account] were nonmarital property and not transmuted."

The court continued:

"The current value of [the NT Account], however, is not only attributable to Ilona's nonmarital contributions but also to the initial balance of marital funds of $125,876.32 in the account in January 2015, and the appreciation on the combined assets. Thus, any value in [the NT Account] above the nonmarital contribution of $1,952,893.9[8], is marital property. The account is awarded to Ilona and she is entitled to her nonmarital portion of $1,952,893.9[8], with the remaining value as marital property."

¶ 16 The trial court also granted James's petition to terminate temporary maintenance, retroactive to October 31, 2021. The court held: "James shall pay Ilona the maintenance owed for June, July, August, September, and October, 2021, totaling $23,000, within 45 days." The trial court found that James did not willfully violate the temporary maintenance orders and denied Ilona's eighth and ninth petitions seeking to hold James in indirect civil contempt.

¶ 17                                            ANALYSIS

¶ 18 On appeal, James argues that the trial court erred in classifying $1,952,893.98 of assets in the NT Account as non-marital property and in "failing to designate a marital source" for his retroactive maintenance obligation to Ilona. James does not dispute that Ilona's inheritance contributions were originally non-marital assets but contends that these contributions transmuted into marital property upon being deposited into the NT Account. Ilona challenges the trial court's determination that maintenance was to be distributed from marital assets.

¶ 19                         Classification of Northern Trust Account Assets

¶ 20    The disposition of property in dissolution of marriage proceedings is governed by section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act). 750 ILCS 5/503 (West 2020). Section 503(a) of the Act requires the trial court to specifically classify property as either marital or nonmarital before authorizing distribution in a dissolution proceeding. 750 ILCS 5/503(a) (West 2020); *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 68. The trial court's classification findings will not be disturbed unless they are against the manifest weight of the evidence. *Foster*, 2014 App (1st) 123078, ¶ 68. A court's finding is not against the manifest weight of the evidence unless the opposite conclusion is clearly apparent or the finding is unreasonable, arbitrary, or not based on the evidence presented. *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 23.

¶ 21    Section 503(b)(1) creates a rebuttable presumption that all property acquired by either spouse after the marriage begins and before a judgment of dissolution of marriage has been entered is marital property. 750 ILCS 5/503(b)(1) (West 2020). This presumption is only overcome by clear and convincing evidence that the property was acquired by a method listed in section 503(a), which includes "property acquired by gift, legacy or descent or property acquired in exchange for such property." 750 ILCS 5/503(a)(1). "Clear and convincing evidence" has been defined as "that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question." *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12. A party may overcome the presumption of marital property by tracing the property to a nonmarital source. See *In re Marriage of Jelinek*, 244 Ill. App. 3d 496 504 (1993) (The "[t]racing of funds is a procedure which allows the court to find that property which would otherwise fall within the definition of marital property is actually non-marital property under one of the statutory exceptions.").

¶ 22    Ilona was unable to identify the exact date the NT Account was opened or the source of $120,825.33 worth of PIMCO stock that constituted the sole asset of the account on January 1,

2014. Therefore, the trial court properly classified the initial shares of PIMCO in the NT Account (which had grown to $127,387.28 by July 31, 2015) as marital property.

¶ 23        In August 2015, Ilona began receiving distributions from John's Trust B following Vilma's death. That same month, she transferred $70,518.04 in securities and $10,017.75 in cash to the NT Account. In September 2015, Ilona transferred $107,492.25 in securities and $291.38 in cash to the NT account. In December 2015, Ilona transferred $108.57 into the NT account.

¶ 24        Once Ilona began receiving distributions from Vilma's Trust in August, 2016, she transferred $1,357,596.99 in securities from Vilma's Trust to the NT account. In September 2016, Ilona transferred $29.55 in cash to the NT account. On October 28, 2016, Ilona transferred $104,144.10 in securities and $302,695.25 in cash to the NT Account. In total, Ilona transferred $1,952,893.98 in cash and securities from inheritance funds to the NT Account.

¶ 25        Initially, James contends that Ilona failed to prove that three of the transfers—$70,518.04 in August 2015, $291.38 in September 2015, and $108.57 in December 2015—came from inheritance funds. However, Northern Trust statements reflect that $70,518.04 in securities were transferred into the NT Account in August 2015, a wire transfer of $291.38 in cash was transferred into the NT Account on September 16, 2015, and $108.57 in cash was transferred into the NT Account in December 2015. In addition, Ilona testified that the securities she inherited from Vilma's estate were the only assets distributed into the NT Account. Accordingly, the circuit court's determination that Ilona's inheritance funds were the source of these three transfers is not against the manifest weight of the evidence.

¶ 26        James next argues, and Ilona concedes, that the circuit court erred in finding that "no deposits were made into or withdrawals taken from the account since the transfers in October, 2016." The record confirms that Ilona made numerous withdrawals from the NT Account between

November 2016 and June 30, 2021, totaling $431,957.35. Ilona argues that this error was harmless. We agree.

¶ 27    As a general rule, "not every error committed by the trial court in a civil case leads to reversal." *In re Marriage of Wilder*, 122 Ill. App. 3d 338, 344-45 (1983). That is because "[p]arties are not entitled to error-free trials, but fair trials, free of substantial prejudice." *Perry v. Murtagh*, 278 Ill. App. 3d 230, 240 (1996). The burden to establish prejudice is on the party seeking reversal, which is only required "where it appears that the outcome might have been different had the error not occurred." *Wilder*, 122 Ill. App. 3d at 344-45; *Goldstein v. Scott*, 108 Ill. App. 3d 867, 879 (1982).

¶ 28    There is no evidence that Ilona's *withdrawals* from the account reflected an intent to gift her inheritance to the marital estate or otherwise impacted the court's classification of Ilona's inheritance funds as nonmarital property. After the withdrawals, the value of the assets in the NT Account was $2,716,078.45—more than the inheritance funds Ilona deposited into the account. Additionally, the court recognized that "no deposits were made" into the account after October 2016. This finding is consistent with Ilona's testimony that the $1,952,893.98 in assets came entirely from her inheritance funds.

¶ 29    James also argues that Ilona's inheritance fund contributions to the NT Account were commingled with the marital funds and transmuted into marital property. Section 503(c)(1A) of the Act provides that when "marital and non-marital property are commingled by one estate being contributed into the other *** the contributed property *loses its identity*, the contributed property transmutes to the estate receiving the property." (Emphasis added.) ILCS 5/503(c)(1A)(i) (West 2020). Conversely, "[i]f the contributed property retains its identity, it does not transmute and remains property of the contributing estate." ILCS 5/503(c)(1A)(ii) (West 2020) Where marital

and non-marital property are commingled into newly acquired property "*resulting in a loss of identity of the contributing estates*, the commingled property shall be deemed transmuted to marital property." (Emphasis added.) 750 ILCS 503(c)(B) (West 2020).

¶ 30    " 'The principle of transmutation is based on the presumption that the owner of the nonmarital property intended to make a gift of the property to the marital estate.' " *Id.* ¶ 74 (quoting *In re Marriage of Olson*, 96 Ill. 2d 432, 439 (1983)). "[T]here is no presumption that commingled property is always transmuted into marital property." *Foster*, 2014 IL App (1st) 123078, ¶¶ 73, 75. "That nonmarital funds were deposited into a marital account does not establish beyond question that the funds were transmuted into marital property," and the nonmarital property can retain its identity even after being deposited into the marital account. *In re Marriage of Steel*, 2011 IL App (2d) 080974, ¶¶ 8, 72. "Whether nonmarital funds have lost their identity through commingling requires attention to the specific history of those funds," and courts look to the party's ability to trace the source of the funds. *Id.* ¶ 76.

¶ 31    In *Foster*, the husband opened a Scottrade account in his name only after separating from his wife (but before the marriage was dissolved). *Foster*, 2014 IL App (1st) 123078, ¶ 33. The Scottrade account was funded with $75 from a checking account opened in the husband's name the month before. *Id.* ¶ 32. The husband deposited inheritance funds into the checking account and testified that "it was never his intention that the funds received from his inheritance would be distributed to [his wife]." *Id.* ¶¶ 16-19, 32-34. The trial court found that the husband failed to overcome the presumption that these funds were marital. *Id.* ¶ 50.

¶ 32    On appeal, this court disagreed, finding that the husband had "established by clear and convincing evidence that the Scottrade account was his nonmarital property" and that the husband had sufficiently traced the nonmarital funds in the account with "documentary evidence of the

transfer of the funds from one account to the other" and he "did not move funds between other accounts." *Id.* ¶ 99. Although the funds were commingled with marital funds, they did not lose their identity as nonmarital property and were not transmuted into marital property. *Id.*

¶ 33        Similarly, Ilona opened the NT Account on her own to trade securities. Aside from the marital funds initially deposited into the NT Account, Ilona sufficiently traced the nonmarital funds "with documentary evidence of the transfer of [inheritance] funds from one account to the other." *Id.* The trial court correctly held that the marital assets used to open the account were clearly segregated from Ilona's inherited assets, which the court found sufficiently traced and easily identified. *Id.* Therefore, the trial court's determination that Ilona's inheritance fund transfers of $1,952,893.98 never transmuted to marital property was not against the manifest weight of the evidence.

¶ 34        James also argues that the language in the trial court's order is "conflicting" as to the division of the NT Account and its assets. Specifically, James contends that "it is unclear how the division [of assets] is to take place" because the trial court ordered that "[t]he account is awarded to Ilona and she is entitled to her nonmarital portion of $1,952,893.9[8], with the remaining value as marital property" and also stated that it was awarding Ilona "her nonmarital portion of $1,952,893.98" with "any remaining value of the account to be shared 50/50 between the parties."

¶ 35        Ilona maintains that the trial court's order was sufficiently clear because "it is obvious that the intention of the trial court was to award the entire Northern Trust Account" to her, allocating part of it as her non-marital property and part of it to her 50% share of the marital estate." The order provides that "any remaining value of the account to be shared 50/50 between the parties." This language reflects the trial court's intention that any value in the account in excess of Ilona's $1,952,893.98 inheritance would be divided equally as marital property. It follows that the trial

court's classification of Ilona's $1,952,893.98 inheritance funds as nonmarital property is not against the manifest weight of the evidence.

¶ 36                                    Maintenance

¶ 37        James next argues that the trial court erred by "failing to designate a marital source of the $23,000 payment to Ilona for interim maintenance from June through October 2021." Ilona responds that the trial court properly required James "to pay the $23,000 maintenance arrearage from his awarded assets and income."

¶ 38        We review a trial court's decision regarding spousal maintenance for an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 52. Ultimately, a maintenance award must be reasonable "and what is reasonable depends upon the facts of each individual case." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 652 (2008). It is the burden of the party challenging the award of maintenance to show an abuse of discretion. *Id.* at 651.

¶ 39        Here, the trial court ordered James to "pay Ilona the maintenance owed for June, July, August, September, and October, 2021, totaling $23,000, within 45 days." James does not challenge the award of retroactive maintenance. His only objection is that the court did not designate the *source* from which the payment is to be made. He argues that ambiguity in the trial court's order should be resolved in favor of awarding maintenance "from pre-division marital assets." We agree that the order is unclear regarding this issue.

¶ 40        This court's decision in *Heroy* supports James's contention that the court intended his maintenance obligation to be paid from the marital estate. In *Heroy*, the wife filed a petition for temporary support two months after filing for dissolution. *Heroy*, 385 Ill. App. 3d at 658-59.

Pursuant to an agreed order, the wife was awarded $6,000 in "nontaxable support" throughout the dissolution proceedings. *Id.* After trial, the court held that the wife "is awarded maintenance in the amount of $4,500 per month," retroactive to the date she filed the petition for temporary support, "in addition to the $6,000 a month temporary support [the husband] paid to [the wife] during the divorce proceedings." *Id.* at 650, 659.

¶ 41        On appeal, the husband argued, *inter alia*, that the spousal maintenance award should have been funded from marital assets existing prior to the property division, rather than his post-division share. *Id.* at 660. We observed that because the wife's temporary maintenance was funded by the marital estate, "retroactive temporary maintenance should similarly come from the parties' marital estate." *Id*. However, since "[t]he trial court did not specify the source from which the retroactive temporary maintenance was to come," we remanded for clarification regarding whether the maintenance award should be funded by the marital estate. *Id.*

¶ 42        Similarly, the trial court's December 21, 2017, order awarding Ilona $9,000 per month in temporary maintenance from James does not specify a funding source. On September 9, 2019, the trial court modified that order, reducing James's temporary maintenance obligation to $4,600 per month and allowing James to "withdraw funds from his retirement" to "the extent necessary" to satisfy the maintenance obligation. Following trial, the court granted James's March 16, 2021, petition to terminate temporary maintenance, retroactive to October 31, 2021, and held: "James shall pay Ilona the maintenance owed for June, July, August, September, and October, 2021, totaling $23,000, within 45 days."

¶ 43        As in *Heroy*, Ilona's temporary maintenance award was to be funded with marital assets, *i.e.,* James's retirement accounts. See *In re Marriage of Davis*, 215 Ill. App. 3d 763, 773 (1991) ("[P]ensions and other retirement benefits earned during the marriage are marital assets."). It

follows that the court likely intended Ilona's retroactive maintenance award to also be funded with marital assets.

¶ 44    Ilona asserts that the trial court's September 9, 2019, order allowing the use of retirement assets to pay James's temporary maintenance obligation was "vacated by a subsequent [November 7, 2019] order substituting it with an order allowing a pre-distribution of marital assets to both parties from which James could pay the maintenance with retirement assets allocated to James as opposed to marital assets." The September 7, 2019, order states, in relevant part: "[E]ach party shall receive an equal amount of *** distribution from the parties' marital estate of $40,000 from James' retirement funds" and "[t]he distribution shall be grossed up for taxes to $120,000 total." The November 7, 2019, order authorizes James to withdraw $350,000 in retirement funds. After taxes and payments to the parties' attorneys, James and Ilona were each to receive $82,000 in retirement funds. The order also states, in relevant part: "This order is a substitute for a prior order entered September 9, 2019 authorizing a withdrawal from the Retirement Plan in the amount of $120,000. The September 9, 2019 order is hereby vacated." Since the November 7, 2019, order does not reference maintenance, it is unclear whether the court intended to vacate that portion of the September 9, 2019, order.

¶ 45    Therefore, we remand to the trial court, for clarification regarding whether Ilona's retroactive maintenance award of $23,000 is to be funded from the marital assets.

¶ 46                                   CONCLUSION

¶ 47    The trial court's classification of $1,952,893.98 of assets in the NT Account as nonmarital property was not against the manifest weight of the evidence. The trial court's intention regarding whether retroactive spousal maintenance is to be funded with marital assets is unclear. For the

forgoing reasons, we affirm the trial court's judgment of dissolution of marriage and remand with directions.

¶ 48         Affirmed and remanded with directions.